UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S-3 4:17 CR00198 JAR |
| | ) | |
| GERALD FITZGERALD HUNTER, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S TRIAL BRIEF

Comes now the United States of America, by and through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Erin Granger, Stephen Casey, and James Redd, Assistant United States Attorneys for said district, and submits this brief and memorandum intended as a general guide for the Court. It is not intended as a comprehensive statement of the Government's case, nor is it intended to be in the nature of a bill of particulars that would fix, bind, or in any way limit the Government to a set theory of proof.

## I.    INTRODUCTION

The Indictment charges Defendant Gerald Hunter with the following offenses: (1) conspiracy to distribute and possess with the intent to distribute fentanyl, in violation of Title 21, U.S.C. §§ 841(a)(1) and 846; (2) conspiracy to distribute and possess with the intent to distribute cocaine, in violation of Title 21, U.S.C. §§ 841(a)(1) and 846; (3) possession with intent to distribute fentanyl, in violation of Title 21, U.S.C. § 841(a)(1); (4) conspiracy to commit money laundering, in violation of Title 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h); and (5) conspiracy to commit money laundering, in violation of Title 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i)

and 1956(h).

The events set forth below involve a long-term, organized narcotics trafficking organization and the Government will present extensive evidence of the same as outlined in the facts section below, including, but not limited to, Title III electronic intercepts, eyewitness testimony of narcotics transactions, significant drug seizures, and financial transactions. The Government will also offer evidence that includes co-conspirator statements made in furtherance of this drug distribution and money laundering conspiracy.

The Government has provided its initial notice of anticipated expert testimony. The Government anticipates presenting expert testimony to explain basic drug trafficking methods to the jury. The scope of the testimony will be consistent with that allowed by existing Eighth Circuit precedent. The United States will also present evidence pursuant to Rule 404(b) tending to show Hunter's motive, intent, knowledge, absence of mistake, or lack of accident.

## II.   <u>FACTS</u>

### A.   Introduction and Background

This case involves an organized crime conspiracy of narcotics distribution in which Hunter distributed cocaine and fentanyl in multi-kilogram amounts.   As part of the conspiracy, Hunter, operating in the Central District of California, Eastern District of Missouri, and elsewhere, obtained bulk quantities of controlled substances. Hunter then organized multi-kilogram sales of cocaine and fentanyl to others, including co-Defendant Andon Templer, who was operating in St. Louis, Missouri.   The evidence shows that the conspirators in this case are experienced, sophisticated, large-scale traffickers of narcotics.

### B.  General Background and History of Drug Trafficking Activities

The evidence will establish the general methods of operation of drug dealers, including methods and conduct that are part of this case.   These methods include: (1) developing a narcotics source of supply or a "plug," often times from source narcotic locations to purchase bulk quantities of narcotics at wholesale prices; (2) large-scale transportation of narcotics from source locations to ultimate distribution destinations; (3) complex and compartmentalized communication methods, including phones and other electronic communication devices and applications; (4) use of counter-surveillance and tactics to evade police surveillance; (5) utilization of traps and hidden compartments in vehicles and various storage containers to hide narcotics and United States currency; and (6) utilization of various individuals to conduct financial transactions to both facilitate the drug trafficking and conceal the sources of the proceeds generated from drug trafficking.

### C.  Distribution of Fentanyl and Cocaine in the Eastern District of Missouri in 2016 and 2017

In November 2016, St. Louis Metropolitan Police Department (SLMPD) Detective Thomas Scanlon received information from a confidential source (CS#1) who advised investigators that co-defendant Bryan Warren was distributing controlled substances.   Between September 2016 and January 2017, investigators utilized CS#1 to purchase fentanyl from Warren. Following, on February 6, 2017, the Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri, signed an order authorizing investigators with the Drug Enforcement Administration (DEA) to intercept wire and electronic communications to and from three cellular telephones belonging to Warren.

Through the interception of communications, investigators identified Andon Templer as a

3

possible fentanyl supplier to Warren.   Investigators also identified Templer's girlfriend, Kashita Webb, as a facilitator in the organization and identified her phone number as (314) 598-8776. Through surveillance and intercepted calls, investigators learned that Webb would pick up drug proceeds on behalf of Templer.

Investigators also learned that members of the drug trafficking organization (DTO) utilized various stash houses to assist in the distribution of narcotics. Specifically, investigators conducted surveillance and learned that Warren utilized a residence at 1282 Hodiamont, St. Louis, Missouri as a possible stash house.   Investigators also learned that Templer utilized OSG Towing, located at 3840 Cote Brilliante, St. Louis, Missouri as a possible distribution site.

On March 7, 2017, the Honorable John A. Ross, United States District Judge for the Eastern District of Missouri, signed an order authorizing the continuing interceptions wire and electronic communications to and from three cellular telephones belonging to Warren and the initial interception of wire and electronic communications to and from one cellular telephone belonging to Templer.

On March 16, 2017, investigators intercepted communications between co-defendant David Campbell and Warren.   Based on the communications, investigators believed they were setting up an imminent drug deal.   Investigators set up surveillance near 1282 Hodiamont.   They observed Campbell park his vehicle and enter the residence.   Minutes later, Campbell exited the residence and entered his vehicle. SLMPD Officers Joseph Scalzo and Kevin Miller conducted a traffic stop of Campbell's vehicle.   Campbell granted officers consent to search his vehicle. Officers located a black backpack with rubber gloves, sandwich baggies, a digital scale and two plates with residue.   Officers deployed a K-9 which alerted to the vehicle.   A subsequent search

4

of Campbell's vehicle revealed suspected drugs in the front panel of the vehicle.   The items were taken the SLMPD laboratory where they were tested and found to contain fentanyl.

On April 4, 2017, the Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri, signed an order authorizing the continuing interceptions of wire communications to and from a cellular telephone belonging to Warren and the initial interception of wire and electronic communications to and from two cellular telephones belonging to Templer. Thereafter, DEA seized 47.4 grams of fentanyl from Warren on April 17, 2017.   On April 19, 2017, DEA intercepted calls between Templer and co-defendant Forestell Sheppard where they arrange a deal for narcotics.   Officers set up surveillance outside OSG Towing and observed Templer.   SLMPD Officer Andrew Kelley stopped Sheppard's vehicle after it departed from OSG towing.   Officer Kelley observed Sheppard making furtive movements and asked him to exit the vehicle.   Officer Kelley then recovered knotted baggies containing a rock-like substance from Sheppard.   A search of the vehicle revealed a bag which contained gloves, respirators, and baggies.   Officers submitted the rock-like substance to the SLMPD laboratory where it was tested and determined to be approximately 54 grams of cocaine.

On April 17, 2017, DEA utilized a confidential source (CS#2) to purchase 47.4 grams of fentanyl from Warren.   Thereafter, on April 24, 2017, DEA utilized CS#2 again to purchase fentanyl from Warren.   CS#2 met Warren at 1282 Hodiamont and purchased 488 grams of fentanyl from Warren.

**D. Investigators Seize 26.5 Kilograms of Fentanyl and Hunter Flees from Law Enforcement**

On April 27, 2017, at 2:43 p.m., investigators intercepted a call between Templer and

Hunter, who was utilizing phone number (213) 407-4335[1]:

HUNTER:     What it do?

TEMPLER:     What's up with you? You good?

HUNTER:     Yeah shit probably get off the plane right now.

TEMPLER:     Oh alright then I'm gonna make another loop then around.

HUNTER:     Okay. Alright.

[VOICE OVERLAPS]

TEMPLER:     Alright.

At 2:52 p.m., investigators intercepted the following additional call between Templer and Hunter:

HUNTER:     What it do? We in the front?

TEMPLER:     Alright bro we pullin' up. You downstairs or upstairs?

HUNTER:     Downstairs.

TEMPLER:     Alright then.

HUNTER:     Alright.

Based on the above calls, investigators believed Hunter had traveled from Los Angeles, California to St. Louis, Missouri to meet with Templer and engage in drug trafficking. Investigators obtained flight records confirming Hunter and co-defendant Walter Justiniano had traveled from Los Angeles, California to St. Louis, Missouri on Southwest flight number 786 which was scheduled to depart Los Angeles at 9:10 a.m. and arrive to St. Louis at 2:45 p.m. on

---

[1] Toll analysis on Kashita Webb's phone (314) 598-8776 revealed contact between Webb and phone number (213) 497-4335 which was subscribed to Gerald Hunter.   Investigators were aware that Hunter resided in Los Angeles, California.

April 27, 2017.   These airline tickets were purchased on April 26, 2017 by Rachel Madison. The airline records show, however, that both the contact phone number (323) 481-3045 and email address rainamadison93@yahoo.com for these flight reservations belong to co-defendant Raina Madison.

Investigators conducted surveillance and reviewed precision location data on one of Templer's phones.   From precision location data, investigators located Hunter, Justiniano, Webb and Templer at a residence located at 1025 Lacouer, Kirkwood, Missouri.   Investigators observed Templer exit the residence and enter a black Infiniti Q6.   He then departed the area.   Investigators observed Hunter, Justiniano, and Webb exit 1025 Lacouer and enter a blue Chevrolet Traverse, which was driven by Webb.   Investigators followed Webb as she drove Justiniano and Hunter to an apartment at 3838 Park in St. Louis.   Justiniano exited the vehicle carrying two pieces of luggage.   All three individuals went inside the apartment where they remained for a short period of time.   Investigators then observed all three exit the apartment.   Hunter carried a large black rolling bag.   They then entered the Chevy Traverse and drove to Webb's mother's address at 3050 St. Catherine.   Following their departure from 3050 St. Catherine, investigators followed Hunter, Justiniano, and Webb to Life Storage, a storage facility located at 450 W. Washington in St. Louis. Webb drove the Chevy Traverse to storage unit #227 and parked the vehicle in front of that unit.

TFO Robert Lang observed Hunter standing on the passenger side of Webb's vehicle. Hunter looked around the area as he stood on the side of her vehicle.   After several minutes, Hunter approached the storage unit, opened the door, and entered the storage locker.   After remaining inside for several minutes, Hunter exited the locker and walked to the rear of the Chevy Traverse and opened the door.   Hunter then walked back inside the storage locker and removed a

7

black duffel bag from the locker, which he placed in the rear of the Traverse.   Hunter then returned to the storage locker and exited with a blue duffel bag which he also carried to the Traverse. Thereafter, Hunter entered the front passenger seat of the Traverse.   Based on their observations, investigators believed the duffel bags contained controlled substances.

Investigators also observed Justiniano exit storage locker #227 with a backpack and enter the Chevy Traverse.   The three occupants then attempted to exit the storage facility.   As Webb attempted to exit the gate, investigators approached the vehicle.   Hunter began to yell at Webb to flee the area.   TFO Lang ordered Webb to stop; however, she placed the vehicle in reverse and attempted to leave the area.   Investigators followed the vehicle as it maneuvered through the storage facility.   Webb subsequently stopped the vehicle and Justiniano fled from the vehicle. Hunter attempted to run while dragging the black and blue duffel bags which he had previously placed inside the vehicle.   TFO Lang ordered Hunter to stop.   Hunter then dropped the duffel bags and fled across the lot.   Hunter was able to successfully evade arrest, leaving behind his flip flops and a black coat which contained an identification card in the name of "Gerald Hunter" and United States currency.

Investigators detained Justiniano and Webb.   Investigators searched Webb's vehicle and located numerous cellular telephones.   Investigators opened the duffel bags and located 28 packages of suspected narcotics.   The narcotics were later tested at a laboratory and found to contain approximately 26.5 kilograms of a mixture or substance containing fentanyl.   DEA Fingerprint Specialist Derek Connell processed the packaging of the fentanyl and identified two prints on the green plastic wrapping.   One of the prints was identified as Hunter's and the other was identified as Justiniano's print.

Templer and co-defendant Shaneisha Settle were later arrested at 2945 Delmar.   A search of Settle's purse revealed $1,855.

### E.   Investigators execute search warrants on properties connected to the DTO

In the early morning hours of April 28, 2017, investigators executed a number of search warrants on properties connected to the DTO.   Investigators also executed a search warrant on the storage locker and officers located various shipping containers and furniture inside the locker. Additionally, they located and seized green and clear plastic wrap which was consistent with the packaging found on the fentanyl seized on April 27, 2017.

Investigators also executed a search warrant at OSG Towing, located at 3840 Cote Brilliante.   Investigators seized, *inter alia,* a bag containing 20 grams of fentanyl, two kilo presses and two grinder jars, bottles with lactose powder, multiple firearms and a digital scale. Additionally, investigators executed a search warrant at 1025 Lacouer Drive.   Inside the basement, investigators located a Macy's credit card in the name of Gerald Hunter inside a backpack, a money counter, and $11,750.   They also discovered a black scale and drug ledger in the dining room and $23,835 in the master bedroom.

Further, investigators executed search warrants at residences located at 3838 Park, apartment 205 and 2945 Delmar.   At the Park address, investigators seized a digital scale, two rolls of wrapping film, a respirator with filters, and mail addressed to Templer and Webb.   At the Delmar address, investigators located a bottle of lactose, two electronic scales, a Glock .40 caliber pistol, a red hydraulic jack, and two steel hydraulic presses.

Finally, investigators executed a search warrant at 1282 Hodiamont, a stash house utilized by Warren.   Investigators located a digital scale and ziplock baggies.   Warren was taken into

custody at his residence located at 459 Bacon.   From his residence, officers located $12,698.
From Warren's jail calls, investigators later learned that there was a large sum of money at the
1282 Hodiamont residence which had been missed during the search warrant.   Investigators later
recovered $74,250 from a female who had removed the money from the residence.

### F.   Identification of Raina Madison and Financial Transactions made by Madison and other members of the DTO

As a result of the numerous arrests and search warrants executed in April 2017,
investigators seized numerous cellular telephones including a cellular telephone utilized by Webb.
Pursuant to a search warrant later obtained by SA Jarryd Powell, the devices were later searched
by Forensic Examiner David White.

Through further investigation, investigators learned that Raina Madison worked as a
facilitator for Hunter's DTO.   She purchased flights for Justiniano and Hunter to travel to and
from Los Angeles to St. Louis to engage in drug trafficking.   Specifically, between 2016 and
2017, she purchased the following flights:

- Southwest Flight 618 for Gerald Hunter from Los Angeles to St. Louis on January 22, 2016, purchased for $510.98

- Southwest Flight 2289 for Walter Justiniano from Los Angeles to St. Louis on January 23, 2016, purchased for $486.98

- American Airlines Flight 1567 for Gerald Hunter from St. Louis to Los Angeles on January 24, 2016, purchased for $681.09

- American Airlines Flight 1258 for Walter Justiniano from Los Angeles to St. Louis on February 18, 2016, with a return flight on American Airlines Flight 1258 on February 19, 2016 from St. Louis to Los Angeles, purchased for $914.20

- American Airlines Flight 2442 for Walter Justiniano from Los Angeles to St. Louis on April 11, 2016, purchased for $487.10

- American Airlines Flight 1578 for Walter Justiniano from Los Angeles to St. Louis on

10

June 16, 2016, purchased for $485.10

- American Airlines Flight 2733 for Gerald Hunter from St. Louis to Los Angeles on June 18, 2016, purchased for $345.10

- American Airlines Flight 1258 for Walter Justiniano from Los Angeles to St. Louis on July 13, 2016, purchased for $305.10

- American Airlines Flight 2566 for Gerald Hunter from St. Louis to Los Angeles on July 16, 2016, purchased for $491.10

- American Airlines Flight 2403 for Gerald Hunter and Walter Justiniano from Los Angeles to St. Louis on September 1, 2016, purchased for $976.20

- Southwest Flight 371 for Gerald Hunter and Walter Justiniano from Los Angeles to St. Louis on September 30, 2016, booked by Madison

- American Airlines Flight 1258 for Walter Justiniano from Los Angeles to St. Louis on October 13, 2016, purchased for $488.10

- American Airlines Flight 2444 for Gerald Hunter from St. Louis to Los Angeles on October 15, 2016, purchased for $438.10

- American Airlines Flight 2403 for Gerald Hunter from Los Angeles to St. Louis on November 8, 2016, purchased for $488.10

- Southwest Flight 3144 for Walter Justiniano from Los Angeles to St. Louis on November 10, 2016, purchased for $488.98

- American Airlines Flight 1258 for Gerald Hunter and Walter Justiniano from Los Angeles to St. Louis on December 9, 2016, purchased for $976.20

- American Airlines Flight 2403 for Gerald Hunter and Walter Justiniano from Los Angeles to St. Louis on February 15, 2017, purchased for $976.40

- American Airlines Flight 1705 for Gerald Hunter and Walter Justiniano from Los Angeles to St. Louis on February 24, 2017, purchased for $976.20

- American Airlines Flight 1705 for Walter Justiniano from Los Angeles to St. Louis on March 2, 2017, purchased for $488.20

- American Airlines Flight 2444 for Gerald Hunter from St. Louis to Los Angeles on March 4, 2017, purchased for $488.20

11

- American Airlines Flight 707 for Gerald Hunter and Walter Justiniano from Los Angeles to St. Louis on April 12, 2017, purchased for $976.40

Madison purchased these airline tickets using her Wells Fargo bank account ending in 6225.   A review of Madison's bank records reveals that between January 2015 and June 2017, monthly cash deposits were made into Madison's accounts.   Several days or weeks after these deposits were made, a large withdrawal was made on the account leaving the account balance down to several dollars.   For example, on February 16, 2017, Madison's account had a balance of $3.57.   Following several cash deposits totaling over $4,000, Madison spent over $3,400 in airline tickets and shipping of a vehicle through Montway Car Transport.   This pattern of cash deposits and withdrawals for airline tickets and shipping companies was constant from January 2015 through April 2017.   Following Hunter's flight from police, Madison stopped purchasing airline tickets for Hunter and Justiniano and stopped making shipping company purchases.   Additionally, frequent large deposits made and withdrawn from her account also ceased.

Through the course of the investigation, investigators learned that Hunter would have vehicles shipped to St. Louis from California.   These vehicles were utilized to transport drug proceeds from St. Louis to Los Angeles.   In 2014, Madison purchased a 2010 Nissan Rogue and paid $14,200 in cash for that vehicle.   In 2016, Madison purchased a purchased a 2014 Nissan Rogue and paid $22,000 in cash.   During that 2016 purchase, Hunter was present with Madison. Madison also paid various shipping companies to ship these Nissan vehicles to St. Louis where they were loaded up with drug proceeds and then returned to Los Angeles.   Between 2015 and 2017, Madison paid over $4,500 to ship these vehicles from Los Angeles to St. Louis.   Analysis of Madison's tax history reveals that she did not have the income to make all of these purchases.

### G.  Temne Hardaway purchases real estate on behalf of Gerald Hunter to conceal the nature of the proceeds

In addition to identifying Madison as one of Hunter's co-conspirators, investigators learned that Temne Hardaway also assisted Hunter with drug trafficking and money laundering. Specifically, Hunter utilized Hardaway to purchase real estate on his behalf, to conceal the source of the funds.   On February 21, 2017, Hardaway purchased a residence located at 3931 W 58th Place, Los Angeles, California for $650,000.   She then transferred the property to her business Second Chance Financing, on July 26, 2017.   An analysis of the financial transactions reveal that Joseph Childress and Ronald Omar Green entered into a purchase agreement with Hardaway for the property.   Childress and Green gifted $350,000 to Hardaway for the purchase of the house. The remaining money to pay for the residence came from cashier's checks and wires to Hardaway's accounts.   Prior to the closing on the house, over $302,127 was deposited into escrow.   The primary source of the escrow deposits was currency.   Specifically, ten deposits were made in three different business names identified as Second Chance Financing, Cornerstone & Associates Corp, and Stone Realty Associates.   The deposits were also made through Hardaway; her mother, Michelle Harris; and her grandmother, Louise Harris.   These deposits occurred over a two-day period beginning February 23, 2017 through February 24, 2017.

Further analysis of these accounts show the following breakdown of the payment of $302,127:

| Date | Payee | Amount | Instrument |
|------|-------|--------|------------|
| 2/23/17 | Louise A Harris | $9,000 | Wire Bank of America (BOA) |
| 2/24/17 | Louise Harris | $9,500 | Cashier's Ck BOA |
| 2/24/17 | Louise Harris | $9,500 | Cashier's Check California CU |

13

| Date | Payee | Amount | Method |
|------|-------|--------|--------|
| 2/23/17 | Temne A Hardaway | $14,000 | Wire BOA |
| 2/23/17 | Second Chance Financing (Temne A Hardaway) | $26,000 | Wire BOA |
| 2/24/17 | Second Chance Financing (Temne A Hardaway) | $10,127 | Wire BOA |
| 2/23/17 | Cornerstone & Associates (Ronald Cunningham) | $100,000 | Wire California Bank & Trust |
| 2/24/17 | Stone Realty & Associates (Ronald Cunningham) | $106,000 | Wire JP Morgan Chase Bank |
| 2/24/17 | Michelle Harris | $9,000 | Cashier's Ck First Entertainment |
| 2/24/17 | Michelle Harris | <u>$9,000</u> | Cashier's Ck First Financial CU |

**$302,127**

Prior to this money being deposited in escrow, analysis of each of the payee's bank accounts reveals that cash deposits were made into these accounts before these transfers. For example, prior to Louise Harris making a $9,000 wire on February 23, 2017 and writing cashier's checks for $19,000 on February 23, 2017, $28,300 was deposited into her bank account. These were all cash deposits. Tax records reflect that Hardaway's reported income for 2016 was under $25,000. Tax returns for her company Second Chance Financing show that the company did not file taxes in 2017 or 2018.

### H. Introduction of CS#3 and his drug trafficking involvement with Hunter and Hardaway

On December 7, 2017, DEA Special Agents Danya Johnson and Dean Jengelley met with CS#3 who had information on Hardaway and Hunter. CS#3 advised agents that Hardaway was mailing him a package of fentanyl. Accompanied by agents, CS#3 went to retrieve his mail from a UPS store in Atlanta, Georgia. CS#3 received a package which contained a substance which

14

later tested positive for .94 grams of fentanyl.   Prior to this exchange, CS#3 had traveled to Los Angeles and met with Hardaway.   Hardaway advised CS#3 that she had large quantities of fentanyl to sell for $45,000.   During this meeting, she requested CS#3 to obtain a fraudulent identity for Hunter who remained a fugitive following his flight from law enforcement in St. Louis on April 27, 2017.

On April 3, 2018, investigators with DEA St. Louis met with CS#3.   CS#3 advised investigators that he had met with Hardaway and Hunter in February 2018.   During the meeting, Hunter advised CS#3 that he (Hunter) could get "anything" for CS#3. Based on the conversation, CS#3 interpreted Hunter to be referring to drugs or guns.   CS#3 advised investigators that he had procured a false identification in the name of "Kenyatta Conrad Slade" for Hunter and had mailed that license to Hunter.

In the presence of investigators, CS#3 made two recorded phone calls to Hardaway. During one of the calls, CS#3 and Hardaway discussed Hardaway obtaining fentanyl for CS#3 and also discussed Hunter's fraudulent identification.   Following, on May 21, 2018, Hardaway mailed CS#3 a package containing fentanyl.   Surveillance cameras at the post office at 5350 Wilshire Boulevard, Los Angeles, captured Hardaway mailing the package to CS#3.

Two days later, CS#3 went to Los Angeles, California to meet with Hardaway and discuss the distribution of fentanyl.   CS#3 went to see Hardaway at 3138 W 58th Place, the residence she had purchased on February 23, 2017.   During the meeting, CS#3 was equipped with a covert audio recording device.   Once inside the residence, CS#3 made contact with Hardaway and Hunter. They discussed improvements that both Hunter and Hardaway made to the property and the purchase of the residence   They also discussed Hunter's involvement in the house.   Specifically,

the following conversation occurred:

> Hardaway:    All these things have like, built our, you know,
>              relationship…
>
> CS#3:        Relationship a lot.
>
> Hardaway:    Even if this was [Inaudible] that made the relationship.
>              Because, we had got the house before that even happened.
>              And so, it was then in my name. Um…[Inaudible] he was
>              gonna…really, you know, do it in my name, but we were
>              going to transfer it out… to his. [Inaudible] But when this
>              happened, it, of course, set back [Inaudible]
>
> CS#3:        Right.
>
> Hardaway:    What happened was… Because my Escrow Company, you
>              know, I know the lady, right? The people called the Escrow
>              Company, and said…
>
> CS#3:        the people?
>
> Hardaway:    Yes. And was like "Oh, we're investigating. We want to know the
>              history." But they wanted…I guess…because…they was trying to
>              see if he had something to do with it. His name is nowhere on there.

CS#3 and Hardaway also discussed Hunter's flight from law enforcement on April 27, 2017 and the false identification that CS#3 had obtained for Hunter.   Further, Hardaway and CS#3 discussed the distribution of fentanyl and how much fentanyl Hunter and Hardaway could obtain for CS#3.

On July 12, 2018, a Grand Jury sitting in the Eastern District of Missouri, returned a superseding indictment against Gerald Hunter, Temne Hardaway, and Raina Madison.   On July 16, 2018, the Honorable Steve Kim, United States Magistrate Judge for the Central District of California, authorized a search warrant for 1039 and 1041 South Citrus Avenue, two apartments connected to Hardaway.   The next day, agents executed the search warrants and arrested

Hardaway at 1041 South Citrus Avenue.   During the search of that residence, investigators located a passport photograph of Hunter which was used to make the fraudulent license for Hunter, approximately $82,321.00 in U.S. currency, and nine cellular telephones.   Hardaway was placed under arrest.   Investigators did not locate Hunter at that time.

### I.   Arrest of Hunter on May 12, 2020

Investigators continued to look for Hunter.   The United States Marshals Service (USMS) began investigating possible locations where Hunter was residing.   Through their investigation, USMS learned that Hunter was residing at 12855 West Runway Road, Apartment 1533, Playa Vista, California and had been living at that residence for approximately eight months.

On May 11, 2020, the Honorable Rozella A. Oliver, United States Magistrate Judge for the Central District of California, authorized a search warrant for 12855 West Runway Road, Apartment 1533.   On May 12, 2020, investigators observed Hunter walking towards apartment 1533 carrying two backpacks.   Investigators identified themselves as law enforcement and Hunter began running down the hallway in an attempt to escape.   Hunter was apprehended.   A search incident to arrest of Hunter revealed a wallet containing a California identification card and California Driver's license in the name "Delano Young."   Investigators also seized eleven cellular telephones and one SanDisk flash drive from Hunter's backpacks.   A search of the residence revealed $220,786 in U.S. currency, documents in the name "Delano Young," a screenplay titled "G-Code," sheets of notebook paper titled "Bricks," and a typed narrative of Hunter's upbringing.

### III.   ELEMENTS OF THE CHARGED CRIMES

### A.   Conspiracy to Possess and Possess with the Intent to Distribute Fentanyl and Cocaine

Count One of the Indictment charges Hunter with a conspiracy to distribute and possess

17

with intent to distribute 400 grams or more of a mixture or substance containing fentanyl in violation of Title 21, United States Code, Section 846.   The elements of this violation are that (1) Hunter and at least one other person reached an agreement to distribute or possess with the intent to distribute fentanyl; (2) Hunter voluntarily and intentionally joined in the agreement, either at the time it was first reached or some later time while the agreement was still in effect; (3) Hunter knew the purpose of the agreement at the time he joined; and (4) the offense involved 400 grams or more of a mixture or substance containing fentanyl.

Count Two of the Indictment charges Hunter with a conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine in violation of Title 21, United States Code, Section 846.   The elements of this violation are that (1) Hunter and at least one other person reached an agreement to distribute or possess with the intent to distribute cocaine; (2) Hunter voluntarily and intentionally joined in the agreement, either at the time it was first reached or some later time while the agreement was still in effect; (3) Hunter knew the purpose of the agreement at the time he joined; and (4) the offense involved five kilograms or more of a mixture or substance containing cocaine.

### B.       Possess with the Intent to Distribute 400 Grams or More of Fentanyl

Count Three of the Indictment charges Hunter with possession with the intent to distribute 400 grams or more of a mixture or substance containing fentanyl.   To establish that a defendant possessed a controlled substance with the intent to distribute it under Title 21 United States Code, Section 841(a)(1), the Government has to establish beyond a reasonable doubt that the defendant (1) knowingly (2) possessed 400 grams or more of fentanyl (3) with the intent to distribute it.   *See United States v. Marquez*, 462 F.3d 826 (8th Cir. 2006).   The defendant need not know what the

18

controlled substance is if he knows he has possession of some controlled substance.   *United States v. Ramos*, 814 F.3d 910, 915 (8th Cir. 2016), <u>as corrected</u> (Feb. 23, 2016).

### C.    Conspiracy to Launder Money

Counts Four and Five of the Indictment charge Hunter with conspiracy to launder drug proceeds in violation of Title 18, United States Code, Section 1956(h).   The elements of this offense are: (1) two or more persons reached an agreement or understanding to conduct illegal financial transactions; (2) the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached, or at some later time while it was still in effect; and (3) at the time the defendant joined in the agreement or understanding, she knew of the purpose of the agreement or understanding.

Title 18, United States Code, Section 1956(a)(1)(B)(i) is the underlying offense of the conspiracy charged in Count Four. The essential elements of this charge are: (1) the defendant conducted at least one financial transaction which affected interstate or foreign commerce; (2) the defendant conducted the financial transaction(s) with money that involved the proceeds from the unlawful distribution of fentanyl and cocaine; (3) at the time the defendant conducted the financial transaction(s), the defendant knew the money represented the proceeds of some form of unlawful activity;  and  (4)  the  defendant  conducted  the  financial  transaction(s)  knowing  that  the transaction(s) were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the conspiracy to distribute fentanyl and cocaine.

Title 18, United States Code, Sections 1956(a)(1)(A)(i) is the underlying offense to the conspiracy charged in Count Five. The essential elements of this charge are: (1) the defendant conducted at least one financial transaction which affected interstate or foreign commerce; (2) the

defendant conducted the financial transaction(s) with money that involved the proceeds from the unlawful distribution of fentanyl and cocaine; (3) at the time the defendant conducted the financial transaction(s), the defendant knew the money represented the proceeds of some form of unlawful activity; and (4) the defendant conducted the financial transaction with the intent to promote the carrying on of the conspiracy to distribute fentanyl and cocaine.

## IV.   <u>LEGAL ISSUES</u>

### A.   The Drug Trafficking and Money Laundering Conspiracy

Evidence adduced at trial will establish the existence of a drug and money laundering conspiracy.   The evidence will show that Defendant Hunter knew of the conspiracy, and intentionally joined the conspiracies.   Simply put, he conspired to acquire, transport, and distribute fentanyl and cocaine in furtherance of this long-term conspiracy.   Further, he agreed with other persons to violate the substantive provisions of the money laundering statute.

Pursuant to 21 U.S.C. § 846, the government must prove: "(1) that there was a conspiracy to distribute the drugs; (2) that Hunter knew of the conspiracy; and (3) that Hunter intentionally joined the conspiracy."   *United States v. Sanchez*, 789 F.3d 827, 834 (8th Cir. 2015). "In order to prove the existence of a conspiracy, 'the government must show an agreement between at least two people and that the agreement's objective was a violation of the law.'"   *United States v. Jenkins*, 78 F.3d 1283, 1287 (8th Cir. 1996) (*quoting United States v. Escobar*, 50 F.3d 1414, 1419 (8th Cir. 1995)).   The essence of a conspiracy is an agreement between two or more participants to achieve a particular illegal end.   *United States v. Santos*, 541 F.3d 63, 71 (2nd Cir. 2008).   "A single conspiracy may exist even if the participants and their activities change over time, and even if many participants are unaware of, or uninvolved in, some of the transactions."   *United States v.*

*Donnell*, 596 F.3d 913, 923 (8th Cir. 2010) *cert. denied*, 131 S. Ct. 309 (2010) and *cert. denied*, 131 S. Ct. 994 (2011).

Proof of a formal agreement is unnecessary; an implied understanding is sufficient. *United States v. Hoelscher*, 914 F.2d 1527, 1534 (8th Cir. 1990). That is, the agreement may be tacit and based upon the actions of the defendant and others. *Donnell*, 596 F.3d at 923. Proof of an overt act in furtherance of the conspiracy is also not required. *United States v. Shabani*, 115 S. Ct. 382, 383 (1994); *United States v. White*, 408 F.3d 399, 401 (8th Cir. 2005); *United States v. Johnson*, 2012 WL 1382519 at *2 (E.D. Mo. 2012).

To be a conspirator, one does not have to be aware of the existence of all other conspirators or all the details of the conspiracy. *United States v. Huggans*, 650 F.3d 1210, 1222 (8th Cir. 2011) *cert. denied*, 132 S.Ct. 1583 (2012). However, the Government must show some element of cooperation beyond mere knowledge of the existence of the conspiracy. *United States v. Slagg*, 651 F.3d 832, 840 (8th Cir. 2011) (finding record was "replete" with evidence of regular cooperation between conspirators from which jury could infer "ongoing, facilitative relationship between parties who were aware of the scope of one another's activities") (quoting *United States v. Roach*, 164 F.3d 403, 412 (8th Cir. 1998)). A defendant may be criminally liable for any substantive crime committed by a co-conspirator in the course and furtherance of the conspiracy. *United States v. Bowie*, 618 F.3d 802, 815 (8th Cir. 2010).

Finally, a conspirator need not join a conspiracy at its inception. Each person joining a conspiracy is taken to adopt, and is bound by, the prior acts and statements made in furtherance of the common objective. *See United States v. Foxx*, 544 F.3d 943, 953 (8th Cir. 2008) ("When a defendant joins a conspiracy in its later stages, the concept of foreseeability (a forward-looking

concept) must be turned around 180 degrees and be applied to the conduct of co-conspirators occurring before the entry of [that] particular defendant") (alterations in original) (internal quotation marks omitted).   In fact, once proof of a conspiracy is shown, only slight additional evidence is necessary to connect a particular defendant with it.   *United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004); *United States v. Mathison*, 157 F.3d 541, 551 (8th Cir. 1998).

To prove a conspiracy, the government need not show its precise contours, only its existence and the defendant's willing participation.   *Id.*, *citing United States v. Slagg*, 651 F.3d 832, 840 (8th Cir. 2011).   A conspiracy may be a "loosely knit organization."   *Id.*, *quoting United States v. Baker*, 855 F.2d 1353, 1357 (8th Cir. 1988).   Members of the conspiracy may change over time.   *Id.*, *citing Slagg*, 651 F.3d at 840.   A conspiracy to distribute controlled substances may be established by the testimony of co-conspirators, which is often corroborated by investigation.   *Id.*, *citing United States v. Espinoza*, 684 F.3d 766, 776 (8th Cir. 2012); *United States v. Rodriguez-Ramos*, 663 F.3d 356, 362 (8th Cir. 2011).

Proof of conspiratorial intent, of course, may be established through circumstantial evidence. *United States v. Santos*, 541 F.3d 63, 72 (2nd Cir. 2008), citing *United States v. Gore*, 154 F.3d 34, 40 (2nd Cir. 1998).   In fact, the Government may rely "wholly on circumstantial" evidence to prove the existence of a conspiracy.   *Donnell*, 596 F.3d 913 at 923.   Where there is evidence the defendant had knowledge of the conspiracy and knowingly took actions advancing the conspiracy's aims, the jury is ordinarily permitted "to infer intent and agreement from knowledge," particularly in the context of the defendant's "interested cooperation, stimulation, and instigation," or when the defendant has a "stake in the venture."   *Id.*, *quoting United States v. Zambrano*, 776 F.2d 1091, 1095 (2nd Cir. 2985).   "The defendant's participation in a single

22

transaction, on an appropriate record, suffice to sustain a charge of knowing participation in an existing conspiracy." *Id.*, *citing United States v. Miranda-Ortiz*, 926 F.2d 172, 176, *cert. denied*, 502 U.S. 928 (1991). "The defendant need not know the identities of all the other conspirators, nor all of the details of the conspiracy." *Id.*, *quoting Gore*, 154 F.3d at 40. "A defendant need not have joined a conspiracy at its inception or in order to incur liability for the unlawful acts committed both before and after he or she became a member. *Id.*, *citing United States v. Rea*, 958 F.2d 1206, 1214 (2nd Cir. 1992).

As described more fully in the facts outlined above, the United States will present extensive evidence from which a reasonable jury may find that: (1) there was a conspiracy; (2) Defendant Hunter knew of the conspiracy; and (3) Defendant Hunter knowingly joined the conspiracy.

### B. Co-conspirator Statements and Admissions

The Government will offer evidence of co-conspirator statements made in furtherance of this drug distribution and money laundering conspiracies. Moreover, some of the statements will also be offered as direct admissions and/or adoptive or tacit admissions. The Government moves for a preliminary ruling, pursuant to *United States v. Bell*, 573 F. 2d 1040, 1044 (8th Cir. 1978), that these statements are admissible. The statements would be admitted conditionally, subject to the requisite foundation being laid.

In *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978), the Eighth Circuit established a procedure for the district court to employ when faced with a co-conspirator's statement. In part, the *Bell* court stated, "[i]f the prosecutor propounds a question which obviously requires a witness to recount an out-of-court declaration of an alleged coconspirator, the court, upon a timely and appropriate objection by the defendant may conditionally admit the statement." *Id.* at 1044.

23

Under *Bell*, after a statement is conditionally admitted, the district court makes a final ruling regarding admissibility at the conclusion of the evidence "as to whether the government has carried its burden of proving by a preponderance of the evidence that the statement was made during the course . . . of the conspiracy." *United States v. Chahia*, 544 F.3d 890, 897 n.4 (8th Cir. 2008) (citing *United States v. Bell*, 573 F.2d at 1044).

Under *Bell*, it is the district court who makes the determination whether the government has proven, by a preponderance of the evidence that the conspiracy existed. *Bell*, 573 F.2d at 1044. A court may consider the co-conspirator's statement itself when determining whether a conspiracy existed, however, the Government must produce independent evidence to establish the existence of the conspiracy. *Blakeney*, 876 F.3d at 1134; *Whitlow*, 815 F.3d at 434.  It is solely the role of the district court to evaluate witness credibility in making that determination. *Llach v. United States*, 739 F.2d 1322, 1329 (8th Cir. 1984) ("[T]he trial judge has wide discretion and must be satisfied only that there is independent evidence, credible and sufficient to support a finding of a joint undertaking.")

Preliminarily, the Federal Rules of Evidence provide that a statement is not hearsay when it "is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E); *see also United States v. Young*, 753 F.3d 757, 771 (8th Cir. 2014).  The evidentiary predicates for admissibility of a co-conspirator's statements are: "(1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy."  *United States v. Blakeney*, 876 F.3d 1126, 1134 (8th Cir. 2017) (quoting *United States v. Beckman*, 222 F.3d 512, 522 (8th Cir. 2000)).  Notably, for this

exclusion to apply, there is no requirement that the declarant be unavailable.  *United States v. Inadi*, 475 U.S. 387 (1986); *United States v. Gardner*, 447 F. 3d 558, 561 (8th Cir. 2006). Moreover, "for the purposes of Rule 801(d)(2)(E), it is irrelevant whether the witness was a member of the conspiracy or acting in furtherance of the conspiracy."  *United States v. Dinwiddie*, 618 F. 3d 821, 836 (8th Cir. 2010).

For a co-conspirator's statement to be admissible at trial, the existence of the conspiracy and the defendant's and declarant's complicity in the conspiracy must be proved only by a preponderance of evidence.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Cowling*, 648 F.3d 690, 698 (8th Cir. 2011).   In *Bourjaily*, the Supreme Court held that a court may consider the hearsay statements themselves for the purpose of making the preliminary factual findings required by Rule 801(d)(2)(E).  *Id*. at 178; *see also United States v. Ragland*, 555 F.3d 706, 713 (8th Cir. 2009).   In addition, the necessary preliminary findings may be supported completely by circumstantial evidence, or a defendant's own conduct and admissions.  *Id*. at 181. *See also United States v. Townsley*, 843 F.2d 1070, 1084 (8th Cir. 1988).

"In order to admit a statement under Rule 801(d)(2)(E), the district court must 'find by a preponderance of the evidence that a conspiracy existed involving the declarant and the party against whom the statement is offered and that the statements were made by the declarant in the course of and in furtherance of the conspiracy.'"  *United States v. Cowling*, 648 F. 3d 690, 698 (8th Cir. 2011).   The trial court may consider the hearsay statements themselves for the purpose of making the preliminary factual findings required by Rule 801(d)(2)(E).  *Bourjaily v. United States*, 483 U.S. 171 (1987).   In addition, the requisite preliminary finding may be supported completely by circumstantial evidence or by a defendant's own conduct and admissions. Co-

conspirator statements may be admitted conditionally, subject to evidence being later introduced that the statements were made by a coconspirator during the course and in furtherance of the conspiracy.   *United States v. Bell*, 573 F. 2d 1040, 1044 (8th Cir. 1978).   Ultimately, this Court must make explicit findings on whether the Government has ultimately met its burden of establishing the required foundation for challenged coconspirator statements.   *Cowling*, 648 F. 3d at 698, *citing United States v. Spotted Elk*, 548 F. 3d 641, 661 (8th Cir. 2008).   The record should reflect careful consideration of the foundational requirements in light of any objections or requests for rulings.   *United States v. Roach*, 164 F. 3d 403 (8th Cir. 1998).

### The statements were made during the course of the charged conspiracy

The first of the foundational requirements for admissibility under Rule 801(d)(2)(E) requires that the Government prove by a preponderance of the evidence that the proffered statements were made "during the course of" the charged conspiracy.

The language "during the course and in furtherance of the conspiracy" has been afforded a broad construction under Rule 801(d)(2)(E).   *Ragland*, 555 F.3d at 713 (8th Cir. 2009); *United States v. Cazares*, 521 F.3d 991, 999 (8th Cir. 2008).   Since the statements must advance the objectives of the conspiracy, the nature of the statements, along with when and under what circumstances they were made, must be considered.   *United States v. Mayberry*, 896 F.2d 1117, 1121 (8th Cir. 1990); *Ragland*, 555 F.3d at 713.   Accordingly, the "in furtherance" requirement is satisfied where the statement in question furthers in any way objectives of the conspiracy. *United States v. Manfre*, 368 F.3d 832, 838 (8th Cir. 2004); *United States v. Guerra*, 113 F.3d 809, 814 (8th Cir. 1997).

26

Whether the statements were made "during the course of the conspiracy" depends upon the nature of the particular conspiracy alleged.   *United States v. Handy*, 668 F. 2d 407, 408 (8th Cir. 1982).   While the time frame alleged in the indictment does not absolutely establish its "course," *Grunewald v. United States*, 353 U.S. 291, 407 (1957), it is well-established that the conspiracy "continues" so long as the evidence shows a "continuity of action" aimed at accomplishing the purposes of the conspiracy.   *Fiswick v. United States*, 329 U.S. 211, 216 (1946).   "A conspiracy is presumed to exist until there has been an affirmative showing that it has been terminated so long as there is 'a continuity of purpose and continued performance of acts.'"   *United States v. Williams*, 87 F. 3d 249, 253 (8th Cir. 1996).

 In the instant case, the Indictment alleges that the conspiracy to distribute cocaine and fentanyl began on an unknown date but included January 2011 and continued thereafter until the date of the indictment (September 26, 2019).   Additionally, the Indictment alleges that the conspiracy to commit money laundering charged in count Four began on an unknown date but included January 2017 and continued thereafter until the date of the indictment (September 26, 2019).   Each of the statements the Government will introduce at trial pursuant to Rule 801(d)(2)(E) was made no earlier than January of 2011.   Although most were made on unknown dates, several of the statements the Government will offer are recorded statements which occurred on May 23, 2018.   Therefore, little doubt exists that the statements were made "during the course of the conspiracy."

### The statements were made in furtherance of the conspiracy

Prior to admitting any statements pursuant to Rule 801(d)(2)(E), the Court must next determine whether the Government has demonstrated by a preponderance of the evidence that the

27

statements were made "in furtherance of the conspiracy."    In determining whether the Government has satisfied the "in furtherance" requirement, the Court must determine whether the statement in question furthers in any way the common objective of the conspiracy.   *United States v. Moss*, 138 F. 3d 742 (8th Cir. 1998).   If it does, the statement is made "in furtherance" of the conspiracy for purposes of Rule 801(d)(2)(E).   The phrase "in furtherance of the conspiracy" is to be interpreted broadly.   *United States v. Cazares*, 521 F. 3d 991, 999 (8th Cir. 2008). Statements that describe past events are in furtherance of the conspiracy if they are made to plan future activities.   *United States v. Haldeman,* 559 F.2d 31, 110-11 (D.C. Cir. 1976).

In the context of a drug conspiracy, statements are in furtherance of the conspiracy if they 'discuss the supply source for the illegal drugs . . . or identify a coconspirator's role in the conspiracy. . .''   *Id*.   These are precisely the nature of the statements the Government will seek to admit at trial.   It is anticipated that one of witnesses (CS#3) will testify that during the course of the conspiracy, co-defendant Temne Hardaway identified Defendant Gerald Hunter as being involved in the conspiracy to commit money laundering charged in Count Four and drug trafficking fentanyl as charged in Count One.   CS#3 agreed to cooperate with investigators and wore a concealed recording device during a meeting with Hardaway on May 23, 2018.   Defendant Hunter was present for part of that meeting.[2]   During that meeting, co-defendant Hardaway discussed the renovation of a residence which she purchased for Hunter.   Specifically, Hardaway advised CS#3 that "[w]e bought [the residence] for six-fifty…" and [Hunter] put $105,000 into it, but I had to spend five thousand of my own dollars."[3]   Further, Hardaway stated "because, we

---

[2] Hunter's statements are admissible pursuant to Rule 801(d)(2)(A).
[3] The Government will present this Court with a transcript of the proceeding prior to trial and will highlight the portions it intends to present during trial.

had got the house before that (Hunter's escape from law enforcement) had even happened. And so it was then in my name… but we were going to transfer it out to his."   She also advised CS#3, "his name ain't on no papers" and "at the end of the day, this ain't mine."   These statements are clearly admissible in the conspiracy to commit money laundering as they are made in furtherance of the conspiracy to conceal and attempt to legitimize the drug proceeds.

Additionally, co-defendant Hardaway also discussed drug trafficking with CS#3. Specifically, Hardaway spoke to CS#3 about setting up a deal to provide CS#3 with fentanyl. During the meeting, CS#3 and Hardaway discussed prices for fentanyl that could be supplied to CS#3.   Hardaway referred to the supplier of the fentanyl as "E," "Eric," or "Kenyatta."   These were nicknames that Hardaway used to refer to Defendant Hunter.   Hardaway advised CS#3 that "we have a couple of different sources" for the fentanyl and that when she said "we," she was referring to herself and Hunter.

The statements the Government will offer as trial evidence were "designed to promote or facilitate achievement of the goals of the ongoing conspiracy."   As a result, they were made "in furtherance of the conspiracy" and should be admitted.   *See generally United States v. Frazier*, 280 F.3d 835, 849 (8th Cir. 2002) ("Co-conspirator statements are properly admitted if the Government proves by a preponderance of the evidence that (1) a conspiracy existed; (2) both the declarant and the defendant were members of the conspiracy; and (3) the declarant made the statement during the course and in furtherance of the conspiracy."); *United States v. Arias*, 252 F.3d 973, (8th Cir. 2001) ("For statements to be admissible, it is not necessary that the declarant either be a charged member of the conspiracy or that the declarant be identifiable so long as the statement itself proves reliable."); *United States v. Smith*, 909 F.2d 1164, 1167 (8th Cir. 1990)

(holding that a recordings of wiretap phone conversations were admissible against the defendant under Rule 801(d)(2)(E)).

These statements of co-conspirators made during the course of this conspiracy are admissible because they do not fall within the definitions of hearsay under Rule 801(d)(2)(E) of the Federal Rules of Evidence. *Ragland*, 555F.3d at 713; *Cazares*, 521 F.3d at 998. The Government anticipates that it will present statements made by Hardaway to CS#3. These statements occurred when Hardaway was setting up deals with CS#3 to distribute fentanyl over two recorded calls and when Hardaway met with CS#3 in-person on May 23, 2018, as described more fully in the facts above. These statements were made during the course of the conspiracy and in furtherance of the conspiracy. Moreover, Hunter was present during parts of the May 23, 2018 meeting and participated in that conversation.

### C. Narcotics Expert Witness Testimony

At trial, the Government plans to introduce the expert opinion testimony of Special Agent Jeremiah Henning and other law enforcement officers regarding the importation, distribution, and "street value" of cocaine and fentanyl and the modus operandi of individuals who traffic in drugs including typical structures and roles within cocaine and fentanyl trafficking organizations. This expert testimony will be offered within the parameters of existing Eighth Circuit precedent.

Under Federal Rule of Evidence 702, a qualified witness may testify as an expert, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. A district court may permit law enforcement officers to give expert testimony concerning the *modus operandi* of drug dealers, because most jurors are not familiar with the trade. *United States v. Schwarck*, 719 F.3d 921, 923

(8th Cir. 2013);   *United States v. Robertson*, 387 F.3d 702, 704-05 (8th Cir. 2004) ("The business of drug trafficking and the modus operandi of drug dealers are matters unfamiliar to jurors."); *United States v. Gill*, 513 F.3d 836, 847 (8th Cir. 2008).   Admission of expert testimony or lay opinion testimony is a matter within the broad discretion of the trial judge that will not be disturbed absent an abuse of that discretion.   *United States v. Anderson*, 446 F.3d 870, 874 (8th Cir. 2006); *United States v. Roach*, 644 F.3d 763, 763 (8th Cir. 2011) (advocating standard of "substantial deference").

The Eighth Circuit has repeatedly recognized that Rule 702 permits a district court to allow the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding the business of drug trafficking.   *Robertson*, 387 F.3d at 704 (citing *United States v. Solorio-Tafolla*, 324 F.3d 964, 965 (8th Cir. 2003)) (expert allowed to testify about "(1) the price of drugs in drug trafficking; (2) drug quantities obtained for personal use; (3) drug conspiracies and roles of drug traffickers; (4) how to manufacture methamphetamine; (5) drug investigation and wiretap operations; and (6) the lack of fingerprint evidence on packaging); *Gill*, 513 F.3d at 847 (agent's testimony assisted the jury in understanding "the business of drug trafficking")).

The federal courts as a whole have also routinely permitted law enforcement agents to give expert testimony in a variety of areas concerning drug trafficking.   *United States v. Ham*, 628 F.3d 801, 804 (6th Cir. 2011); *United States v. Urbina*, 431 F.3d 305, 311 (8th Cir. 2005) (practice and knowledge of drug couriers during transport); *United States v. Jeanetta*, 533 F.3d 651, 657 (8th Cir. 2008) (surveillance techniques and use of "innocuous household items" in drug trafficking schemes); *United States v. Jiminez*, 487 F.3d 1140, 1145 (8th Cir. 2007) (pattern of one-way airline

tickets not purchased in advance); *Gill*, 513 F.3d 836 at 847 (link between firearms and drug trafficking); *United States v. Spotted Elk*, 548 F.3d 641, 663 (8th Cir. 2008) (typical use of items involved in manufacture like saran wrap, tin foil and grease); *United States v. Beltran-Arce*, 415 F.3d 949, 951 (8th Cir. 2005) (typical drug record-keeping procedures); *Solorio-Tafolla*, 324 F.3d at 966 (methods of distribution and manufacture).

In this Circuit, it is well settled that narcotics agents may testify as to the nature, quantity, and street value of drugs, as they relate to the defendant's intent to distribute.  *United States v. Kelly*, 679 F.2d 135 (8th Cir. 1982).   In addition, agents have been permitted to testify as to the quantity of narcotics being indicative of distribution, *United States v. Robertson*, 387 F.3d 702, 704 (8th Cir. 2004), the typical usage amounts of the narcotic, *Solorio-Tafolla*, 324 F.3d at 965, the nexus between drug trafficking and firearms, *Gill*, 513 F.3d at 847, and the meaning of jargon and code words, *Beltran-Arce*, 415 F.3d at 951; *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996) ("There is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis.").

Because the proposed expert testimony of SA Henning (and other law enforcement officers) is relevant, helpful to the jury's understanding of the issue and clearly permissible under the law, it should be allowed.

### D.  Audio Recordings and Transcripts

The Government will also introduce recordings of telephone conversations intercepted pursuant to court-ordered wiretaps, telephone conversations between CS#3 and Hardaway, and an in-person meeting between CS#3, Hardaway, and Hunter.

### 1. *Excerpt Calls/Recordings*

While many of the wiretap tapes and consensual recordings to be offered by the Government are audible, they are voluminous in the number of criminal conversations they contain and there are some portions of the calls which are inaudible.   Consequently, excerpts of the calls and meetings containing representative examples of Hunter's, Hardaway, and CS#3's criminal conversations will be offered.   Such excerpts and summary testimony about the same are appropriate.   Fed. R. Evid. 1006; *United States v. Segines*, 17 F.3d 847 (6th Cir. 1994); *United States v. Denton*, 556 F.2d 811, 815-16 (6th Cir. 1977) and cases cited therein.   *See* 5, WEINSTEIN'S EVIDENCE, p. 1006(06).

### 2. *Authenticity of Recordings*

The Eighth Circuit in *United States v. McMillan*, 508 F.2d 101, 104 (8th Cir. 1974), set forth a *prima facie* test to establish the authenticity of electronic surveillance.   This prima facie test includes seven foundation guidelines, where the Government must show that:

> (1) That the recording device was capable of taking the conversation now offered in evidence.
> (2) That the operator of the device was competent to operate the device.
> (3) That the recording is authentic and correct.
> (4) That changes, additions or deletions have not been made in the recording.
> (5) That the recording has been preserved in a manner that is shown to the court.
> (6) That the speakers are identified.
> (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id.* The elements of this test are not rigid, but applied with flexibility based on common sense. *United States v. Webster*, 84 F.3d 1056, 1064 (8th Cir. 1996); *United States v. Roach*, 28 F.3d 729, 733 (8th Cir. 1994).   In *United States v. Scully*, 546 F.2d 255, 269 (9th Cir. 1976), the court dealt with the question of whether the Government could make its *prima facie* authenticity showing

without producing all of the monitoring agents.   In this decision, the court held that this was permissible when agents with knowledge of the surveillance testified.   *Id.*

### 3. *Use of Transcripts*

The Government plans to introduce transcripts of all of the audible conversations played. In the Eighth Circuit, the decision to allow the use of transcripts to assist jurors in listening to a tape recording lies within the sound discretion of the district judge.   *United States v. Chavez-Alvarez*, 594 F.3d 1062, 1069 (8th Cir. 2010); *see also United States v. Placensia*, 352 F.3d 1157, 1165 (8th Cir. 2003) (noting trial court's discretion to admit transcripts of foreign language transcripts even without tape recordings).   Transcripts in the jury room will generally not be considered cumulative when they assist the jury in evaluating the evidence.   *Id*. at 1069.

The use of transcripts aids the jury in a number of ways.   First, transcripts help the jurors follow often poor-quality recordings.   *United States v. Riascos*, 944 F.2d 442, 443 (8th Cir. 1991). These transcripts also help the jurors identify speakers. *United States v. Henneberry*, 719 F.2d 941, 949 (8th Cir. 1983).   Additionally, transcripts assist the jury when portions of the recording are inaudible.   *United States v. Willis*, 774 F.2d 258, 259 (8th Cir. 1985).   Finally, transcripts also aid the jury in understanding colloquialisms in the conversation.   *United States v. Delpit*, 94 F.3d 1134, 1148 (8th Cir. 1996).   Because each of these considerations apply in the case at bar, the jury should be allowed access to the transcripts of all conversations played.

The trial court should allow the use of transcripts only after each party has had an opportunity to verify the accuracy of the recordings and provide their own transcript.   *United States v. Britton*, 68 F.3d 262, 264 (8th Cir. 1995).   Foundationally, this could be the person who prepared the contents.   *United States v. Bentley*, 706 F.2d 1498, 1507 (8th Cir. 1983); *United*

*States v. Frazier*, 280 F.3d 835, 849 (8th Cir. 2002).   However, the Eighth Circuit does not mandate that the foundation for the transcripts be laid by the person who prepared the transcripts, but it may be established by a person who was a party to the conversations.   *United States v. Gordon*, 688 F.2d 42, 44 (8th Cir. 1982); *Frazier*, 280 F.3d at 849-50.

The Court must instruct the jury that differences in meaning may be caused by such factors as the inflection in a speaker's voice or inaccuracies in the transcript and that "any discrepancies [from the transcript] should be resolved in favor of what they heard on the tapes."   *United States v. Scott*, 243 F.3d 1103, 1107 (8th Cir. 2001).   However, once admitted into evidence and given the proper cautionary instruction, the transcripts may be used by the jury in their deliberations. *United States v. Foster*, 815 F.2d 1200, 1203 (8th Cir. 1987); *Chavez- Alvarez*, 594 F.3d at 1069.

### 4.   *Joint Presentation of Audio and Transcripts*

The Government intends to play the audio of telephone calls while a rolling transcript of the call appears on the court monitors.   There will be a highlighted portion of text rolling and synched to the audio file.   This is an aid to assist the jury in identifying the speakers and following the conversation.

### 5.   *Interpretation of Recordings*

After the above recordings are played, the Government intends to ask the witness to summarize and/or interpret the conversations, many of which contain coded language.   The witnesses will have extensive experience in drug investigations and knowledge of the conspiracy's structure and organization.

Federal Rule of Evidence 702 provides that

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The witnesses have, by virtue of their "skill, experience, [and] training" acquired "specialized knowledge" as to the business transactions of the defendant that will "help the trier of fact to understand the evidence." Fed. R. Evid. 702.   This information is "based on sufficient facts or data," and "is the product of reliable principles and methods" such as other law enforcement sources, informant de-briefings, recorded conversations, and interviews.   Moreover, the witnesses "have reliably applied the principles and methods to the facts of the case."   Under these circumstances, Fed. R. Evid. 702 provides that such a witness should be permitted to "testify in the form of an opinion or otherwise."

"It is well established that experts may help the jury with the meaning of jargon and code words." *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996). The Eighth Circuit has stated that "[t]here is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis." *Id*.; *see also United States v. Farmer*, 543 F.3d 363, 370 (7th Cir. 2008) ("[N]arcotics code words are an appropriate subject for expert testimony, and [ ] law enforcement officers who have training and experience in drug-related transactions and crimes are

36

qualified to testify as an expert concerning the practices of people engaged in that type of conduct"); *United States v. Tocco*, 200 F.3d 401, 419 (2d Cir. 2000) ("[E]vidence regarding the inner-workings of organized crime has been held to be a proper subject of expert opinion because such matters are 'generally beyond the understanding of the average layman.'").

The Eighth Circuit Court of Appeals has explicitly held that "[l]aw enforcement officers may testify as experts concerning the modus operandi of drug dealers as such activities are not something with which most jurors would be familiar. Significantly, the Eighth Circuit has held that experts may help the jury with the meaning of jargon and code words." *United States v. Placensia*, 352 F.3d 1157, 1164-65 (8th Cir. 2003) (citing *United States v. Brown*, 110 F.3d 605, 610 (8th Cir. 1997)); *Delpit*, 94 F.3d at 1145.   Under this Court's decisions in *Delpit* and *Placensia*, the case agent is authorized to interpret all of the "drug dealers' cryptic slang," not merely "common drug terminology."   *Delpit*, 94 F.3d at 1145.   Interpretation testimony is allowed where "the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding the business of drug trafficking." *United States v. Robertson*, 387 F.3d 702, 704 (8th Cir. 2004).   This broad standard will encompass the case agent's testimony in this case.

### E.  Self-Authenticating Documents

The Government provided notice on September 10, 2021, Doc. 798 that it will seek the admission of certain business and governmental records pursuant to Rule 902 of the Federal Rules of Evidence.   Copies of the documents were provided during discovery or have otherwise been made available. Many of the documents offered in evidence may be photocopies rather than

originals. Such copies are admissible under Federal Rule of Evidence 1003 unless there is a genuine dispute as to the authenticity of the document.

**F.   Evidence Offered Pursuant to Fed.R.Evid. 403**

As a preliminary matter, the Government intends to admit evidence of drug and financial transactions.   The Government also will move to admit other evidence pursuant to Fed.R.Evid. 403.   To the extent Hunter objects to the admissibility of this evidence, the Government highlights some of this evidence for the Court, as well as the applicable case law.

> **a.   Hunter's flight from law enforcement, attempt to procure false identification, and possession of identifications belonging to another individual are admissible as evidence of consciousness of guilt.**

The Government will introduce in evidence of Hunter's flight from law enforcement on April 27, 2017 and his attempt to flee from law enforcement on May 12, 2020.   Additionally, the Government will introduce evidence that Hunter obtained a false identification and was found in possession of another individual's identification cards when he was arrested on May 12, 2020.

Testimony adduced at trial will establish that on April 27, 2017, members of law enforcement attempted to stop Hunter after witnessing Hunter pull duffel bags containing 26.5 kilograms of fentanyl.   Officers advised Hunter to stop; however, Hunter fled from police and remained a fugitive until he was apprehended on May 12, 2020.   Following his flight from law enforcement on April 27, 2017, Hunter attempted to obtain – and did in fact obtain – a false identification in the name of "Kenyatta Conrad Slade."

On May 12, 2020, numerous law enforcement agencies were involved in the arrest of Hunter, who was then residing in Playa Vista, California.   Investigators observed Hunter walk towards an apartment and made contact with him.   Hunter fled from officers and ran down the

hallway.   Officers took Hunter in custody and searched Hunter incident to arrest.   Officers seized Hunter's wallet which contained an identification card in the name "Delano Young."   The individual in the photograph possessed a similar appearance to Hunter.

### *Evidence of Flight*

It is well settled that flight of the accused subsequent to the commission of a crime is, in certain instances, "a circumstance proper to be laid before the jury as having a tendency to prove his guilt."  *Allen v. United States*, 164 U.S. 492, 499 (1896).   Moreover, as a general rule, flight or escape from custody is considered to be an "admission by conduct."   *United States v. Hankins*, 931 F.2d 1256, 1261 (8th Cir. 1991); *see also United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977).   Evidence of flight, escape from custody, resisting arrest, concealment, taking a false name, and other similar conduct are admissible as evidence that the accused was conscious of their guilt, and therefore, actually guilty of the crime charged.   *Hankins*, 931 F.2d at 1049.

The extent to which flight evidence is admissible leans heavily on its probative value. Probative value of flight as circumstantial evidence of guilt depends "upon the degree of confidence with which four inferences can be drawn:

> (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."

*United States v. Peltier*, 585 F.2d 314, 323 (8th Cir. 1978).

The Eighth Circuit has held that flight evidence is admissible if there is sufficient evidence to warrant an inference that the flight was prompted by considerations related to the present issue. *United States v. Roy*, 843 F.2d 305, 310 (8th Cir. 1988); *see also Peltier*, 585 F.2d at 323. There is no requirement, however, that the flight be actually connected to the crime charged.   Instead,

the requirement is that evidence exists that the flight was connected to a more general "awareness of guilt." *United States v. Eggleton*, 799 F.2d 378, 381 (8th Cir. 1986).

In *Roy*, the defendant participated in a murder and abandoned the victim's body by a tree. He then entered his vehicle and began traveling to North Dakota. While traveling, the defendant hit another vehicle and fled from that scene. Officers went to the scene and attempted to arrest the defendant who ran away from the officers. He was subsequently taken into custody. At trial, the government introduced this flight evidence as consciousness of guilt. On appeal, the Eighth Circuit found the evidence of flight to be admissible and rejected the defendant's argument that the flight was in response to the hit and run. The Court explained, "the fact that [the defendant] also had committed a traffic violation which could have been the reason for his flight does not render evidence of the flight inadmissible to show consciousness of guilt." *Roy*, 843 F.2d at 310. The Court explained that the trip to North Dakota was made immediately after the murder and the flight from police took place within a few hours after the murder. *Id.*

Here, the evidence will show that Hunter indeed fled to avoid apprehension. On April 27, 2017, investigators observed Hunter dragging two bags which contained fentanyl. When investigators advised Hunter to stop, Hunter immediately ran from officers. Following his flight, Hunter sought to obtain a fraudulent identification. Although he secured the identification, Hunter remained paranoid that he would be discovered. For instance, co-defendant Temne Hardaway advised CS#3 that Hunter was afraid to travel because he was worried about airports having facial recognition. Clearly, the initial flight on April 27, 2017 and the procurement of false identifications were "prompted by considerations related to the issue in question." *See also*

40

*United States v. Webster,* 442 F3d 1065 (8th Cir. 2006) (allowing flight evidence and rejecting argument that the defendant may have had other possible reasons for fleeing from police).

Further, his flight was an "integral part of the immediate context of the crime charged." On April 27, 2017, investigators observed Hunter dragging a duffel bag containing fentanyl and ordered him to stop.   Investigators identified themselves as law enforcement and Hunter dropped the bag of fentanyl and fled.   Hunter fled from investigators while he was engaged in the commission of a crime, namely, possession with intent to distribute fentanyl.   There is no doubt his flight was connected to his intention to avoid apprehension.   Indeed, officers recovered fentanyl from the bag that they had observed Hunter dragging.

Moreover, the Government is entitled to produce evidence that explains the circumstances of the investigation and arrest.   *United States v. Lupino,* 301 F.3d 642, 646 (8th Cir. 2002) (citing *United States v. Harris*, 956 F.2d 177, 179 (8th Cir. 1992)).   Evidence of flight and the circumstances of a defendant's arrest may be admitted to demonstrate that the defendant was intentionally hiding or evading capture, which goes to the defendant's consciousness of guilt. *Lupino*, 301 F.3d at 645-46.

Likewise, Hunter's flight from law enforcement on May 12, 2020 is admissible.   Although the flight did not occur immediately after the commission of the crime, flight evidence may still be admissible if there is evidence to warrant the inference that the defendant fled to avoid apprehension.   *Eggleton*, 799 F.3d at 381.   In *Peltier,* the court held that flight which occurs a substantial time after the crime is admissible when there is evidence that the defendant fled to avoid apprehension.   Here, following the seizure of fentanyl on April 27, 2017, a criminal complaint was issued in the Eastern District of Missouri charging Hunter with *inter alia*, the

possession with intent to distribute the fentanyl which was seized on April 27, 2017.   Hunter was aware of the arrest of his co-conspirators and his flight demonstrates he was avoiding apprehension. [propose adding "awareness of guilt" information here]

When allowing flight evidence in, the court should also consider the amount of flight evidence presented in relation to the length of the trial and how much time is necessary for its presentation. *See Peltier*, 585 F.2d at 324.   Once the court has decided that there is sufficient evidence to support a reasonable inference that there is a connection between the accused's flight and their guilt of the charged crime, it is the jury's responsibility to decide what, if any, weight to give the flight evidence.   *Webster*, 442 F.3d at 1067.

### *Evidence of Fraudulent Identifications*

The Government intends to admit into evidence Hunter's procurement of a false identification in the name of "Kenyatta Conrad Slade" and Hunter's possession of identification cards in the name of "Delano Young."   Such evidence is proper because evidence of false names and identifications is relevant and admissible to show consciousness of guilt.   *Eggleton*, 799 F.2d at 381.   *See also United States v. Carr*, 560 F.3d 849 (8th Cir. 2009) (use of a false identification is relevant and admissible to show consciousness of guilt), *United States v. Horton*, 673 F2d 180 (8th Cir 1989) (finding that defendant's use of a false name was relevant and admissible to show consciousness of guilt).

Moreover, possession of other individuals' identifications is evidence of drug trafficking. *See United States v. Jiminez*, 487 F.3d 1140, 1145 (8th Cir. 2007) ("The district court admitted the driver's license that was issued to Salas because drug traffickers often carry another person's

identification to conceal their identity").   Courts have determined that this evidence is relevant

under Fed. R. Evid. 403 because such evidence is relevant and not unfairly prejudicial.

### b. Hunter's possession of $220,786 and eleven cellular telephones and SanDisk, on May 12, 2020 is evidence of drug trafficking

Hunter's possession of $220,786 in United States currency, and eleven cellular telephones

and one SanDisk card, on May 12, 2020 is evidence of drug trafficking.[4]   The charged crimes

include the participation of a drug conspiracy involving the shipment of cocaine and fentanyl from

California to St. Louis. Hunter's possession of electronics and currency "completes the story" or

provides context to the charged crime.   *See United States v. Young*, 753 F.3d 757, 770 (8th Cir.

2014); *United States v. Thomas*, 760 F.3d 879, 884 (8th Cir. 2014); *United States v. Brooks*, 715

F.3d 1069, 1076 (8th Cir. 2013); *United States v. Tyerman*, 701 F.3d 552, 562 (8th Cir. 2012);

*United States v. Ruiz-Chavez*, 612 F.3d 983, 988 (8th Cir. 2010); *United States v. Fleck*, 413 F.3d

883, 890 (8th Cir. 2005); *United States v. LaDue*, 561 F.3d 855, 858 (8th Cir. 2009).   This is

particularly true since the phones and money were part of the res gestae and relevant to issues of

Hunter's knowledge and intent to engage in a drug trafficking conspiracy.

First, there is a close and well-recognized connection between drug trafficking and the

possession of multiple cellular phones. The Eighth Circuit and other courts routinely find

possession of multiple cell phones to be evidence of drug trafficking in and of itself.   *See United

States v. Thompson*, 881 F.3d 629, 633 (8th Cir. 2018) (finding expert testimony that multiple cell

phones were "indicative of drug trafficking" to be evidence of violation of 21 U.S.C. § 841(a)(1));

*Woods v. Norman,* 825 F.3d 390, 397 (8th Cir. 2016) (officer's search "revealed that Woods had

---

[4] The Government does not intend to introduce the content of the electronics seized on May 12, 2020.   These items were searched and a Cellebrite examination was generated.

in his possession a radar detector, two cell phones, and more than $2000 in cash – evidence indicating Wood's involvement in transporting the cocaine); *United States v. Bams*, 858 F.3d 937, 945 (4th Cir. 2017) (discovery of four cell phones and nine cell phones at two separate traffic stops by law enforcement evidence of conspiracy to possess with intent to distribute controlled substances); *United States v. Cardoza*, 713 F.3d 656, 660 (D.C. Cir. 2013) (facts including defendant's possession of three disposable cell phones "increased the likelihood that [defendant] was involved in drug trafficking activity"); *United States v. Young,* 609 F.3d 348, 355 (4th Cir. 2010) (possession of multiple cell phones evidence of drug distribution conspiracy); *United States v. Burkley*, 513 F.3d 1183, 1189 (10th Cir. 2008) (multiple cell phones supported inference that defendant was guilty of drug offense); *United States v. Kelvin Williams*, No. 4:15-cr-00365-NCC/JAR 2016 WL 3166846, *9 (E.D. Mo., May 16, 2016) (citing *Riley v. California*, 134 S.Ct. 2473 (2014) and *United States v. Portalla*, 496 F.3d 23, 27 (1st Cir. 2007) (noting that cell phones are essential tools of the drug trade").

Likewise, Hunter's possession of $220,786 in United States currency demonstrates that Defendant Hunter was involved in drug trafficking. *See United States v. Gilmore,* No. 4:15 CR509 SNLJ/DNN, 2016 WL 3556765, at *8 (E.D. Mo. March 31, 2016)[5] (cash "reasonably believed to be the proceeds of drug trafficking," because it was found near "front door of residence, from which [drugs] had been sold, and because the cash was rolled in the fashion drug traffickers

---

[5] *See United States v. Gilmore,* No. 4:15 CR509 SNLJ/DNN, 2016 WL 3556765, at *8 (E.D. Mo. March 31, 2016), *supplemented*, No. 4:15 CR 00509 SNLJ/DDN, 2016 WL 3556767 (E.D. Mo. May 10, 2016), *report and recommendation adopted in part*, No. 4:15 CR 00509 SNLJ, 2016 WL 3458156 (E.D. Mo. June 24, 2016), *aff'd*, No. 16-3851, 2016 WL 9777278 (8th Cir. Nov. 23, 2016), *and report and recommendation adopted in part*, No. 4:15 CR 00509 SNLJ, 2016 WL 3458156 (E.D. Mo. June 24, 2016), *and aff'd*, No. 16-3851, 2016 WL 9777278 (8th Cir. Nov. 23, 2016)

deal with drug proceeds"); *see also United States v. $12,390,* 956 F.2d 801, 806 (8th Cir.1992) (finding that currency wrapped with rubber bands provided evidence that the currency was related to drug activity).

In *United States v. Darden*, 70 F.3d 1507 (8th Cir. 1995), the defendants challenged the admissibility of a photograph which was seized from a defendant's residence.   The photograph depicted a large amount of money spread out on a bed.   The court found that the photograph was relevant because it tended to show that the defendant or an associate had access to large amounts of cash which was a proposition disputed by the defendants because it showed that they were involved in illegal activity and did not have any legal sources of large income.   *Id.* at 1538.

Evidence at trial will show that Hunter did not have any legitimate source of income and that he engaged in drug trafficking in which he accumulated wealth.   When law enforcement arrested Hunter on May 12, 2020, they searched his backpack and located and a vacuum sealed bag containing currency.   Hunter gave officers consent to search his residence.   Officers located several plastic bags of United States currency in a pull out drawer under the bed and a sock containing currency.   In total, officers seized $220,786.   This money is relevant because it shows that Hunter had access to large amounts of cash and was involved in drug trafficking.

### G.   Intrinsic Evidence and Evidence Offered Pursuant to Fed. R. Evid. 404(b)

As detailed above in Section II, the vast majority of the evidence is intrinsic to the charges in the indictment.   Should the Court determine any of the evidence is not intrinsic, the Government will move to admit the evidence pursuant to Federal Rule of Evidence 404(b), subject to the development of the record.

### 1.   Intrinsic Evidence Background

In *United States v. Young*, the Eighth Circuit affirmed the trial court's admission of evidence of the defendants' other wrongful conduct, finding that Rule 404(b) did not bar the admission of evidence of other wrongful conduct to prove the circumstances and context of the charged conspiracy. 753 F.3d 757, 770 (8th Cir. 2014).   The Court explained that Rule 404(b) applies only to extrinsic, not intrinsic, evidence and discussed the qualities of intrinsic evidence. 'Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred.'   'Such evidence is admitted because the other crime evidence 'completes the story' or provides a 'total picture' of the charged crime.'" *Id.* (internal citations omitted).   "Intrinsic evidence may help to fill the gaps in the jury's understanding of the crime charged. We have also determined that intrinsic evidence is 'inextricably intertwined as an integral part of the immediate context of the crime charged.'"   *Id.*

"Consequently, intrinsic evidence includes both evidence that is inextricably intertwined with the crime charged as well as evidence that merely 'completes the story' or provides context to the charged crime."   *Id.*   Furthermore, in *United States v. Thomas*, the Eighth Circuit affirmed trial court's ruling that evidence of the defendant's involvement in a conspiracy to distribute crack-cocaine was admissible in a trial on charges of the defendant's involvement in a heroin distribution conspiracy.   760 F.3d 879, 884 (8th Cir. 2014).   The Court held that "[a] jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void—without knowledge of time, place, and circumstances of the acts which form the basis of the charge." *Id.*   The Court stated:

> [W]hen evidence of other crimes is so blended or connected, with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged. Thus,

intrinsic, or *res gestae*, evidence may implicate the defendant in other acts or crimes.

*Id.* (some internal citations omitted) (citing *United States v. Fleck*, 413 F.3d 883, 890 (8th Cir. 2005); *United States v. LaDue*, 561 F.3d 855, 858 (8th Cir. 2009)).

Here, as in *Young*, the proffered evidence provides a "total picture" of the crime charged. Rule 404(b) has no bearing on the admissibility of intrinsic evidence providing direct proof of the existence of the conspiracy.

If the evidence is intrinsic to the charged offense, then Rule 404(b) does not prevent the admission of other wrongful conduct. *United States v. Brooks*, 715 F.3d 1069, 1076 (8th Cir. 2013). "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred. Such evidence is admitted because the other crime evidence completes the story or provides a total picture of the charged crime." *Brooks*, 715 F.3d at 1076 (*quoting United States v. Ruiz-Chavez*, 612 F.3d 983, 988 (8th Cir. 2010)). See also *United States v. Tyerman*, 701 F.3d 552, 562 (8th Cir. 2012). Such evidence is also "subject to the dictates of Rule 403, which requires that the probative value of evidence is not substantially outweighed by the danger of unfair prejudice. *United States v. Adams*, 401 F.3d 886, 899 (8th Cir. 2005). *See also United States v. Buckner*, 868 F.3d 684 (8th Cir. 2017) (holding that "[i]ntrinsic evidence 'provides a total picture of the charged crime' or 'tends logically to prove [an] element of the crime charged,' and is subject to testing under regular principles of admissibility.") (internal citations omitted).

In *United States v. Ballew*, 40 F.3d 936, 941-42 (8th Cir. 1994), the defendant was charged with mail fraud and wire fraud "both of which contemplate a 'scheme or artifice to defraud.'" The defendant had reported as stolen and filed an insurance claim on a red 1987 Chevrolet pick-up

47

truck that law enforcement subsequently located at a farm belonging to a friend of the defendant. *Id.* at 940. Further investigation uncovered four additional vehicles at the friend's farm, parts of which the defendant had interchanged with parts of the 1987 red Chevrolet pickup in an attempted to hamper identification of the vehicles. *Id.* Investigators also discovered a blue 1979 Chevrolet truck found at the Horner Farm ("the Horner truck") that had the license plate originally issued to the 1987 red Chevrolet pickup that was the subject of the fraudulent insurance claim. *Id.* The only fraudulent insurance claim in the scheme and artifice to defraud pertained to the red 1987 Chevrolet pickup. *Id.* Following his conviction for mail and wire fraud, Ballew appealed, arguing that the district court had erred in admitting evidence concerning the Horner truck as improperly admitted 404(b) evidence of "other crimes, wrongs, or acts."

The *Ballew* Court found no error in the trial court's admission of the evidence of the Horner truck, finding that "Ballew's objection under 404(b) *mischaracterizes the evidence in question as evidence of 'other crimes, wrongs, or acts.'* . . . It is obvious that parts were switched between the Horner farm truck and the red truck to conceal the identity of the red truck and thus successfully carry out Ballew's scheme to defraud his insurance company. Direct evidence of the crime charged is not subject to the heightened scrutiny of Rule 404(b). We find no abuse of discretion by the District Court in its denial of Ballew's objections to the admission of this evidence." *Ballew*, 40 F.3d at 941 (emphasis added)(citing *United States v. Aranda*, 963 F.2d 211, 213–14 (8th Cir. 1992)).

The Court in *Ballew* further noted that "we believe this evidence [concerning a truck not alleged as the basis for the fraudulent insurance claim] was not only similar in kind and close in time to the offense charged but was direct evidence of the crime charged. No further discussion of

48

this part of the Rule 404(b) test is necessary." *Id.* at 941 n.4. In short, despite the fact that the Horner truck theft was not specifically charged as a substantive count in the indictment, the Court permitted its admission as direct evidence of the scheme and artifice to defraud.

The Government will also seek to introduce intrinsic evidence including, but not limited to, evidence related to the following:

> **a.   Hardaway and Hunter's distribution of fentanyl to CS#3 on December 7, 2017 and May 18, 2018, and discussions of future fentanyl distribution are intrinsic evidence of the drug conspiracy**

On December 7, 2017 and May 18, 2018, co-defendant Temne Hardaway mailed fentanyl to CS#3 in Atlanta, Georgia.   Prior to the mailing of fentanyl, Hardaway and CS#3 participated in two recorded conversations.   Additionally, CS#3 spoke with Hunter and Hardaway about drug trafficking in February 2018 and on May 23, 2018, CS#3 spoke with Hardaway about additional fentanyl she could obtain from Hunter.   This evidence is intrinsic and inextricably intertwined as an as an integral part of the immediate evidence that is offered for the purpose of providing context in which the charged crime occurred.   The indictment in this case charges, in part,

> Beginning on an unknown date and continuing for a time period, including January 2011 and continuing up to the date of this Indictment, with the exact dates unknown, within the Eastern District of Missouri, the Central District of California, and elsewhere,
>
> **GERALD FITZGERALD HUNTER, and**
> **RAINA ELYSE MADISON,**
>
> the defendants herein, did knowingly and intentionally combine, conspire, confederate, and agree together with one or more other persons known and unknown to the Grand Jury, to commit the following offenses against the United States: to distribute and possess with the intent to distribute a mixture or   substance containing a detectable amount of Fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(l),
>
> All in violation of Title 21, United States Code, Section 846.

49

The indictment was returned on September 26, 2019. Doc. 640. Clearly, this drug activity is within the scope of the conspiracy. Although the fentanyl did not pass through the Eastern District of Missouri, it was nonetheless part of the overall conspiracy to distribute controlled substances. To the extent Hunter argues that this conduct occurred outside the timeframe for the conspiracy, Hunter is wrong. *See United States v. Moore*, 639 F.3d 443, 447 (8th Cir. 2011) ("Rule 404(b) does not apply to [drug sales occurring outside the timeframe of the charged conspiracy] because it was not evidence of [defendant's] other crimes, wrongs, or acts. Rather, it constituted evidence plainly relevant to the existence of and [defendant's] participation in the conspiracy charged, and thus was properly admitted.").

Even assuming – without conceding – that this drug activity occurred outside the timeframe of the conspiracy, it would still be admissible. *See United States v. Thomas*, 593 F.3d 752 (8th Cir. 2010) (admission of other crimes evidence of a defendant's participation in and arrest for a subsequent drug trafficking offense was warranted). In *Thomas,* the Court noted that evidence of these crimes is admissible if it is "(1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) proven by a preponderance of the evidence; and (4) if the potential prejudice does not substantially outweigh its probative value." *Id.* at 757. Here, the court concluded that the evidence was proper because it was evidence of intent and knowledge. Although it occurred four years after the charged conduct, "there is no absolute rule regarding the number of years that can separate offenses admitted under Rule 404(b)." *Id.* at 758. Notably, in *Thomas*, the court recognized the similarity of the other acts evidence (" the subsequent-acts evidence is undeniably similar"), which is also present in the case before this Court. *Id.*

50

Importantly, the terms of Rule 404(b) draw no distinction between prior and subsequent acts that would support different analyses. *United States v. Anifowoshe,* 307 F.3d 643, 646-47 (7th Cir. 2002). As a result, court have not applied different analyses to evaluate the admission of prior and subsequent acts. *See, e.g., United States v. DeAngelo,* 13 F.3d 1228, 1231 (8th Cir.) (applying well-established four-factor test to determine admissibility of subsequent act evidence), *cert. denied,* 512 U.S. 1224 (1994).

In *United States v. Sykes*, 977 F.2d 1242, 1246 (8th Cir. 1992), the court held that evidence of an unrelated subsequent drug crime involving the defendant was admissible. *Id.* The evidence was appropriate because it was relevant in showing that Sykes possessed the required knowledge and intent for the present offense. *Id.* The subsequent California crime was virtually identical to the present crime and in both cases the defendant was possession of almost the same amount of PCP. Additionally, the evidence was more probative than prejudicial and the district court gave instructions that the 404(b) evidence was for a limited purpose, minimize the likelihood that prejudice would occur. *Id.*

Here, the subsequent drug activity is clearly admissible. The evidence is (1) relevant to a material issue; (2) is a crime similar in kind and reasonably close in time to the crime charged; (3) sufficient to support a jury finding that the defendant committed the other crimes; and (4) more probative than prejudicial." *United States v. Yerks*, 918 F.2d 1371, 1373 (8th Cir.1990). These other drug offenses are relevant regarding the material issue of knowledge and intent. Additionally, the drug related offenses are similar and aid the jury in finding Hunter committed his other crimes.

Further, similar to the defendant in *United States v. Jackson*, 856 F.3d 1187, 1191 (8th Cir. 2017), should Hunter "advance a general denial of his participation in the conspiracy" the evidence is admissible.   "When a defendant raises the issue of mental state . . . by means of a general denial that forces the government to prove every element of its case, prior bad acts evidence is admissible because mental state is a material issue."   *Jackson*, 856 F.3d at 1191 (citation omitted).   In *Jackson*, the Eight Circuit found "that evidence of drug distribution discovered" at defendant's apartment three years prior to the presently charged conspiracy was "relevant to the material issue of [defendant's] mental state as to the present charged conspiracy" and affirmed the admission of the evidence pursuant to Rule 404(b).   *Id.* at 1191.   Although the case before this Court involves conduct after an initial indictment, *Jackson* is still instructive because the analysis is the same. The later transactions of fentanyl are relevant to the material issue of whether Hunter had the requisite intent to enter the conspiracy.   These transactions go to Hunter's knowledge and intent, as well as his association with Hardaway, undermining any contention that he was not involved in the conspiracy.

## 2.  Evidence Offered Pursuant to 404(b) Evidence

The United States herein gives notice to Hunter that it intends to introduce evidence in its case in chief regarding prior crimes, wrongs, or acts of Hunter including Hunter's 2000 conviction in the United States District Court for the Central District of California for conspiracy to distribute cocaine.   Additionally, the United States moves this Court to admit evidence that Defendant was distributed heroin to various members of the conspiracy.   This evidence is intrinsic to the charged offense and is therefore not subject to Rule 404(b).   However, from an abundance of caution, the United States notifies the defendant of its intended use of the listed evidence.

It is well-settled that "Rule 404(b) prohibits the admission of other bad acts evidence that are offered to prove the character of a person in order to show action in conformity therewith." *United States v. Hill*, 638 F.3d 589, 592 (8th Cir. 2011) (internal quotations omitted).  "This evidence may be admissible, however, for other purposes, including to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'"  *United States v. Turner*, 781 F.3d 374, 389 (8th Cir. 2015).  This Court routinely instructs that Rule 404(b) is "one of inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination."  *United States v. Wilson*, 619 F.3d 787, 791 (8th Cir. 2010) (quoting *United States v. Littlewind*, 595 F.3d 876, 881 (8th Cir. 2010)); *United States v. Cowling*, 648 F.3d 690, 699 (8th Cir. 2011) (same).

Rule 404(b) provides in applicable part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

Fed. R. Evid. 404(b).   In *Huddleston v. United States*, 485 U.S. 681 (1988), the Supreme Court adopted an inclusive approach to evaluating the admissibility of Rule 404(b) evidence.   The *Huddleston* Court found that in enacting Rule 404(b), "[c]ongress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was *with ensuring that restrictions would not be placed on the admission of such evidence*." *Id*. at 688-89. (Emphasis supplied.) Echoing *Huddleston*, this Court routinely instructs that Rule 404(b) is "one of inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination." *United States v. Wilson*, 619 F.3d 787, 791 (8th Cir. 2010) (quoting *United States v. Littlewind*, 595 F.3d 876, 881 (8th Cir. 2010)). *See, e.g., United States v. Cowling*, 648 F.3d 690,

699 (8th Cir. 2011) (same); *United States v. Thomas*, 593 F.3d 752, 757 (8th Cir. 2010) (same); *United States v. Koski,* 424 F.3d 812, 817 (8th Cir. 2005) (Rule 404(b) is rule of inclusion, rather than exclusion, which allows the admission of other crimes evidence relevant to any issue in the trial other than the criminal disposition of the defendant).

Rule 404(b) evidence is admissible if it is: (1) relevant to a material issue; (2) similar in kind and not overly remote in time to the crime charged; (3) supported by sufficient evidence and (4) higher in probative value than prejudicial effect. *United States v. Gant*, 721 F.3d 505, 509 (8th Cir. 2013).   As outlined below, all of this evidence is intrinsic to the drug and money laundering conspiracy or admissible as 404(b) evidence.

### a. Hunter's 2000 conviction in the United States District Court for the Central District of California for conspiracy to distribute cocaine is admissible

As stated above, the Government intends to introduce in evidence Hunter's 2000 conviction in the United States District Court for the Central District of California for conspiracy to distribute cocaine, case number 2:97-CR-00270.   Hunter received a sentence of 200 months in the Bureau of Prisons.   The United States intends to offer the aforementioned evidence to prove Hunter's intent, knowledge and absence of mistake in distributing cocaine and fentanyl and possessing with the intent to distribute fentanyl.

### 1. *Relevance*

Where, as here, Hunter presents a general denial defense and has therefore necessarily placed his state of mind at issue, prior felony drug convictions are relevant to show intent and knowledge.  *United States v. Banks*, 706 F.3d 901, 907 (8th Cir. 2013).   In drug prosecutions, courts routinely admit evidence of prior drug activity or convictions for such crimes as possession

or sale of controlled substances.  *See, e.g., United States v. Thomas*, 398 F.3d 1058, 1062-63 (8th Cir. 2005) (defendant's two prior convictions for distributing crack in prosecution for possession with intent to distribute were admissible to show intent);  *Banks*, 706 F.3d at 906 (admission of prior conviction for possession of marijuana in prosecution for conspiracy to possess controlled substance with intent to distribute to show knowledge and intent); *United States v. Franklin*, 250 F.3d 653, 658 (8th Cir. 2001) (admission of guilty plea for possession of cocaine base admissible in prosecution for possession with intent to distribute cocaine base, cocaine, and heroin to prove knowledge and intent); *United States v. Fang*, 844 F.3d 775, 780-81 (8th Cir. 2016) (admission of two prior convictions for possession of methamphetamine admissible to show knowledge in prosecution for possession with intent to distribute); *United States v. Monds*, 945 F.3d 1049, 1052-53 (8th Cir. 2012) (admission of three prior felony drug convictions in prosecution for possession with intent to distribute cocaine base to show knowledge and intent); *United States v. Horton*, 756 F.3d 569, 579 (8th Cir.) *cert. denied*, 135 S. Ct. 122, 190 L. Ed. 2d 93 (2014) (internal citations and quotations omitted) (evidence of prior possession of drugs is admissible to show such things as knowledge and intent of a defendant charged with a crime in which intent to distribute drugs is an element.).   When prior convictions are admitted for the purposes of demonstrating knowledge or intent, they "need not be duplicates" of the current charge, but only "sufficiently similar to support an inference of criminal intent."  *Thomas*, 398 F.3d at 1063 (internal quotations omitted).

Applying this standard, the Eighth Circuit has consistently held that "evidence of prior possession of drugs, even in an amount consistent with only personal use, is admissible . . . [against] a defendant charged with a crime in which intent to distribute drugs is an element." *Franklin*, 250 at 658 (internal quotations omitted), *United States v. Hardy*, 224 F.3d 752, 757 (8th

Cir. 2000), *Unites States v. Logan*, 121 F.3d 1172, 1178 (8th Cir. 1997).   Like the defendants in each of these holdings, Hunter has a prior conviction for a narcotics related offense.   Moreover, the conviction is the exact same charge as one of his current charges of being involved in cocaine distribution.

### 2. *Similar in kind and not overly remote in time to the crime charged*

This Court applies a reasonableness standard and examines the facts and circumstances of each case to determine if Rule 404(b) evidence is too remote,   *United States v. Strong*, 415 F.3d 902, 905 (8th Cir. 2005), and there is no fixed period during which the prior acts must have occurred. *United States v. Baker*, 82 F.3d 273, 276 (8th Cir. 1996).

Similarly, this Court has approved periods of: eighteen years, where defendant was incarcerated for ten years of intervening period, *United States v. Walker*, 470 F.3d 1271, 1275 (8th Cir. 2006) (sixteen years), *Strong,* 415 F.3d at 906 (fifteen years prior to charged conduct and where defendant's intervening years in custody undercut his challenge to temporal remoteness); *United States v. James*, 564 F.3d 960, 963 (8th Cir. 2009) (fifteen years before trial and ten years prior to charged conduct); *United States v. Yielding*, 657 F.3d 688, 702 (8th Cir. 2011) (ten years prior to charged conduct); *United States v. Ellis,* 817 F.3d 570 (8th Cir. 2016) (nineteen year old conviction for possession of heroin with intent to deliver was admissible when defendant was incarcerated for much of the time), *Banks*, 706 F.3d at 906-07. *But see United States v. Aldridge*, 664 F.3d 705, 713-15 (8th Cir. 2011) (while twelve-year-old and five-year-old convictions were admissible, it was harmless error to admit nineteen and twenty-year-old convictions).

In the instant case, Hunter's conviction for conspiracy to distribute cocaine occurred in 2000 and eleven years elapsed between this prior conviction and the conduct comprising the

conspiracy charged in this case.   However, "there is no absolute rule for the number of years that can separate evidence of offenses admitted under Rule 404(b). Instead [the Court] examine[s] the facts and circumstances of each case and appl[ies] a reasonableness standard." *Thomas*, 398 F.3d at 1063).   In determining whether the prior convictions are impermissibly remote, the Court should consider "the similarities between [the] prior convictions and the current offense." *Id*. Moreover, the Eighth Circuit has held that a defendant's incarceration period is an important circumstance in evaluating remoteness.   In *United States v. Halk*, 634 F.3d 482 (8th Cir. 2011), although nineteen years had elapsed between the prior conviction and the defendant's present case, the defendant's incarceration was a key consideration.   The Court noted that the defendant had been out of prison for six years before he committed the charged offense.   As such, the court held that the conviction was not so remote in time.   *See also United States v. Walker*, 470 F.3d 1271 (8th Cir. 2006) (conviction for armed robbery 18 years prior to the charged offense was admissible under Rule 404(b) when the defendant had been incarcerated for a ten-year period between offenses and had been out of prison for only eight years before committing the instant offense).

Most recently, in *United States v. Michael Grady,* 4:15 CR 404 HEA (Doc. 3100) (March 10, 2021), this Court concluded that a defendant's prior conviction for conspiracy to distribute heroin was admissible as 404(b) evidence in a trial where the defendant faced similar charges. The court explained that,

> "As to the sufficiently similar factor, the conspiracy conviction is sufficiently similar to the charges herein. Both the prior conviction and the current charges center around drug distribution. Defendant's knowledge of drug distribution from the prior conspiracy support an inference of Defendant's intent to conspire in another drug trafficking operation."

Doc. 3100, p. 7.

In the instant case, the 2000 conviction and the current offense are similar because both offenses involve the distribution of cocaine.   With respect to elapse of time, it is crucial to note that Hunter served approximately fourteen years in federal prison in connection with his 2000 conviction.[6]   It would seem only logical that the Court should consider the lengthy term of imprisonment in determining whether Hunter's 2000 conviction is "close in time to the crime charged."   Obviously, Hunter's incarceration would have incapacitated him for the period ending in 2011, theoretically rendering him incapable of committing similar crimes.   The fact that he committed a similar crime almost immediately after his release is highly significant and an "important circumstance" for this Court to consider.

### 3.    *Supported by sufficient evidence*

Hunter's prior conviction also meets the third element of the Rule 404(b) analysis because it is supported by sufficient evidence.   Under Rule 404(b), the Government must prove the prior convictions by "a preponderance of the evidence."   *United States v. Vega*, 676 F.3d 708, 719 (8th Cir. 2012).   This burden will be met if the Government offers a certified copy of the defendant's conviction.   *See United States v. Strong*, 415 F.3d 902, 906 (8th Cir. 2005) (holding that the government provided sufficient evidence of the defendant's prior convictions where a special agent identified certified copies of the convictions).   To meet this burden, the Government is allowed to introduce a certified copy of the defendant's prior conviction through a case agent handling the case at bar.   *Id.* at 904-06; *United States v. Walker*, 470 F.3d 1271, 1274-75 (8th Cir. 2006) (holding that the government properly provided evidence of the defendant's prior conviction by having an agent, who had no connection with the prior conviction, introduce a certified copy of

---

[6] Hunter was charged in 1992 and ordered detained.

the prior conviction).   Because the Government intends to introduce a certified copy of Hunter's prior conviction through an agent who has thoroughly investigated the case at hand, the third element of the Rule 404(b) analysis is met.

### 4.     *Prejudice*

While damaging evidence is always prejudicial, the issue with respect to Rule 404(b) evidence is whether it is <u>unfairly</u> prejudicial.   *Gant*, 721 F.3d at 510.

As observed above, this Court affords great deference to the district court's weighing of the probative value of the evidence against its prejudicial effect.   *Id*.   This Court looks to such criteria as relevance, remoteness and substantive similarity of the crimes to determine whether unfair prejudice exists.   *See, e.g., Banks*, 706 F.3d at 907.   The potential for unfair prejudice is reduced where, as here, the district court gives a limiting instruction which instructs the jury to consider this evidence only as it relates to the issues of knowledge and intent.   *Id.; United States v. Gaddy*, 532 F.3d 783, 790 (8th Cir. 2008). Because Hunter's prior convictions are incredibly probative, and the risk of prejudice is greatly reduced by a cautionary jury instruction, this conviction is admissible under Rule 404(b).

### b.   <u>Hunter's distribution of heroin is admissible because it was part of the res gestae</u>

The United States expects that a co-conspirator will testify that in addition to distributing cocaine and fentanyl, Hunter also distributed heroin during the charged time period.   This heroin evidence is intrinsic to the charged offense.

Rule 404(b) applies to the admission of bad acts that is extrinsic to the charged offense. If, however, the evidence is intrinsic to the charged offense, then Rule 404(b) does not prevent the admission of other wrongful conduct.   *United States v. Brooks*, 715 F.3d 1069, 1076 (8th Cir.

2013).   "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred.   Such evidence is admitted because the other crime evidence completes the story or provides a total picture of the charged crime."   *Brooks*, 715 F.3d at 1076 (*quoting United States v. Ruiz-Chavez*, 612 F.3d 983, 988 (8th Cir. 2010)).   *See also United States v. Young*, 753 F.3d 757, 770 (8th Cir. 2014); *United States v. Tyerman*, 701 F.3d 552, 562 (8th Cir. 2012).   This evidence is also "subject to the dictates of Rule 403, which requires that the probative value of evidence is not substantially outweighed by the danger of unfair prejudice.   *United States v. Adams*, 401 F.3d 886, 899 (8th Cir. 2005).

Under this theory of res gestae then, evidence of other crimes can be admitted when the other crime is "so blended or connected, with the one[s] on trial as that proof of one incidentally involves the other[s]; or explains the circumstances thereof; or tends logically to prove any element of the crime charged."   *United States v. Reinbold*, 135 F.3d 1226 (8th Cir. 1998).   Res gestae is also known as intrinsic evidence and is offered for the purpose of providing the context in which the charged crime occurred.   Such evidence is admissible to complete the story or to provide a total picture of the charged crime."   *See United States v. Parks*, 902 F.3d 805, 813-14 (8th Cir. 2018).

In *United States v. Thomas*, 760 F.3d 879 (8th Cir. 2014), the court held that evidence of the defendant's crack distribution was admissible as intrinsic evidence because it was "so blended or connected" with the heroin conspiracy and helped explain the circumstances of the heroin conspiracy.   Moreover, it was "an integral part of the immediate context of the crime charged." *Id.* at 884, *quoting United States v. Fleck*, 413 F.3d 883, 890 (8th Cir. 2005).   The court noted that several of the testifying witnesses reported receiving both heroin and crack cocaine from the

defendant.   Because the defendant blended his heroin and crack cocaine business together, it was nearly impossible to separate the two drugs even though he was not charged with conspiracy to distribute crack cocaine.   *Id.* at 885.

Similarly, in *United States v. Guzman*, 926 F.3d 991 (8th Cir. 2019), the court found that evidence that the defendant sold marijuana and possessed firearms was admissible as intrinsic evidence in Defendant's trial for conspiracy to distribute methamphetamine.   Specifically, in regard to the marijuana evidence, the court noted that this evidence was inextricably intertwined with the methamphetamine conspiracy because it was discovered in a vehicle which led a search warrant of a residence.   At that residence, investigators seized both methamphetamine and marijuana.   *Id.* at 999.   The court found that the marijuana evidence was admissible in the prosecution for conspiracy to distribute methamphetamine.   The court noted that intrinsic evidence "includes both evidence that is inextricably intertwined with the crime charged as well as evidence that merely 'completes the story' or provides context to the charged crime."   *Id.* at 1000.

The case before this Court is analogous to *Guzman.*   Here, Hunter's distribution of heroin to other individuals was part of the res gestae and so inextricably intertwined with the conspiracy to distribute cocaine and fentanyl.   It completes the story and provides a total picture of the charged crimes.

### H.   Forfeiture Issue

The Indictment contains a forfeiture allegation listing certain property seized by law enforcement during the course of the conspiracy.   If the jury finds Hunter guilty of the charges in the Indictment, the Government will seek forfeiture of all property derived from or used in

connection with these felonies pursuant to the provisions of Title 21, United States Code, Section

853. This is set forth in the Forfeiture Allegation of the Superseding Indictment (Doc. 640), and

the Bill of Particulars for Forfeiture of Property (Doc. 790), that is more particularly described as

follows:

1) Any property constituting or derived from any proceeds Defendant obtained, directly or indirectly, as a result of the offenses of Drug Trafficking or Conspiracy to Commit Drug Trafficking, and any property used, or intended to be used, in any manner or part to commit or facilitate the commission of such offenses;

2) Any property, real or personal, involved in the offenses of Money Laundering or Conspiracy to Commit Money Laundering, or any property traceable to such property;

3) A sum of money in the form of a forfeiture money judgment, said sum representing the total value of:

    a. Any property, real or personal, constituting or derived from any proceeds traceable to the offenses of Drug Trafficking or Conspiracy to Commit Drug Trafficking; and

    b. Any property, real or personal, involved in the offenses of Money Laundering or Conspiracy to Commit Money Laundering, or any property traceable to such property.

4) Certain specific assets, including the following:

    a. Approximately $220,786.00 U.S. Currency;

    b. Assorted Jewelry, more particularly described as:

        i. Men's Stainless Steel Gucci Chronoscope Watch with 54 round diamonds totaling 1.35 carat;

        ii. Men's Gucci 45 mm Dive Watch;

        iii. Pair 14 karat yellow gold round diamond stud earrings totaling 8 carats; and

        iv. Men's 18 karat white gold 40mm Rolex Day-Date watch with Presidential bracelet.

Additional property, including but not limited to approximately $82,321.00 U.S. Currency and the real property located at 3931 W 58th Place, Los Angeles, California, 90043, that were also subject to forfeiture, have already been forfeited in the Final Order of Forfeiture of co-defendant Temne Hardaway (Doc. 789).   As set forth in Federal Rule of Criminal Procedure 32.2(b)(6) and Title 21, United States Code, Section 853(n), notice of said forfeiture was sent to all known parties, including Gerald Hunter, and no claims were filed on behalf of Defendant or any other party.

The forfeiture issues will not be considered until and unless the jury returns a guilty verdict on one or more of the counts giving rise to the forfeiture.   *See* Rule 32.2(b)(1).   In that event, the court must determine what property is subject to forfeiture and the amount of any money judgment that the defendant will be ordered to pay.   Rule 32.2(b)(1)(A).   The court's determination may be based on evidence already in the record and on any additional evidence or information the parties submitted by the parties.   Rule 32.2(b)(1)(B).   The Rules of Evidence do not apply in the forfeiture phase of the trial.   *See United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; the evidence need only be "reliable"); *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (Rule 32.2(b)(1) allows the court to consider "evidence or information," making it clear that the court may consider hearsay; this is consistent with forfeiture being part of the sentencing process where hearsay is admissible).

The Government's burden is to establish the forfeitability of the property by a preponderance of the evidence.   *See Libretti v. United States,* 516 U.S. 2936 (1995) (criminal forfeiture is part of the sentence and not a substantive element of the offense, so "preponderance of the evidence" standard applies).

Generally, the forfeiture determination is made by the court, not the jury.   *See* Rule 32.2(b)(1)(A).   The rule, however, gives Hunter a limited right to have the jury retained to determine the forfeitability of specific property.   Rule 32.2(b)(5).   If the jury is retained after it delivers its verdict on the charges, "[t]he only issue for the jury . . . would be whether the government has established the requisite nexus between the property and the offense" by a preponderance of the evidence. Fed. R. Crim. P. 32.2, advisory cmte. note; *see also United States v. Gregoire,* 638 F.3d 962, 972 (8th Cir. 2011) (holding that jury's role in forfeiture phase of trial is limited to determining the "forfeitability of *specific property*" (emphasis added)).

To invoke this right, Hunter must make his election known to the court prior to the time the jury begins its deliberation regarding his guilt or innocence.   Rule 32.2(b)(5)(A).   The purpose of that provision, which was added to Rule 32.2 in 2009, is to allow the court and the jurors to plan their calendars, and to allow the Government time to prepare special verdict forms and jury instructions, or conversely, to save the court and the Government the judicial resources that would be wasted making such preparations if the defendant intends to waive the jury.   *See* Advisory Committee Note to 2009 Amendment to Subdivision (b)(5)(A).[7]   If Hunter fails to make a timely request to have the jury retained, his right to do so is waived.   *See United States v. Nichols*, 429 F. App'x. 355, 356 (4th Cir. 2011) (per curiam) ("although a defendant has a right to have a jury decide a forfeiture issue, the defendant must affirmatively assert that right," citing Rule

---

[7] The Advisory Committee Note provides, in pertinent part, as follows:

Although the rule permits a party to make this request just before the jury retires, it is desirable, when possible, to make the request earlier, at the time when the jury is empaneled.   This allows the court to plan, and also allows the court to tell potential jurors what to expect in terms of service.

32.2(b)(5)); *see also United States v. Hively*, 437 F.3d 752, 763 (8th Cir. 2006) (holding, under former Rule 32.2(b)(4), that defendant waived his right to have the jury determine the forfeiture by not making a specific request to have the jury retained for that purpose).

The limited right to have the jury determine the forfeiture applies only to specific assets that the Government alleges to have been directly involved in, used in, or traceable to, the offenses giving rise to the forfeiture.   There is no right to have the jury determine the amount of a money judgment that the defendant will be ordered to pay.  *See United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) (the defendant's right under Rule 32.2(b) is to have the jury determine if the Government has established the required nexus between the property and his crime; the rule does not give the defendant the right to have the jury determine the amount of a money judgment); *see also United States v. Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011) (following *Tedder*).

Moreover, in the event the directly forfeitable property is insufficient to satisfy the amount of the money judgment, the Government is entitled to the forfeiture of any other property of Hunter as substitute assets pursuant to 21 U.S.C. § 853(p).   The forfeiture of substitute assets is mandatory, *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006), and there is no right to have a jury determine the forfeitability of substitute assets.  *Id.*   Finally, because the substitute assets may include *any* property of Hunter, they may include property that the jury declined to find to be directly involved in, or traceable to, the offense for which Hunter was convicted.  *See United States v. Bryson*, 105 F. App'x. 470, 475 (4th Cir. 2004) (defendant cannot object to the forfeiture of a substitute asset on the ground that it was not traceable to the offense); *United States v. Swank Corp.*, 797 F. Supp. 497, 504 (E.D. Va. 1992) (order of forfeiture for substitute assets must be satisfied out of something not itself subject to forfeiture; otherwise forfeiture order would be

satisfied out of something that belongs to the United States, rendering substitute assets provision meaningless); *United States v. McCorkle*, No. 6:98-CR-52-ORL-19JGG (M.D. Fla. Jan. 8, 2001) (there is no bar against forfeiture—as a substitute asset—of the property the jury declined to find subject to direct forfeiture).

In this case, the Government is seeking the forfeiture of specific property and a money judgment against Hunter.   The Government will be prepared to establish the forfeitability of the listed assets by a preponderance of the evidence.   Additionally, the United States does not request that any forfeiture determination be made by the jury, but respectfully requests that the court inquire of Hunter, at the latest, prior to deliberations, whether Hunter will be invoking his limited right under Rule 32.2(b)(5) to have the jury retained.

## CONCLUSION

The foregoing are the issues that the Government expects to arise in the trial of this matter. Should additional issues arise that have not been addressed, the Government requests the opportunity to provide additional briefing.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney

*s/ Erin Granger*
ERIN GRANGER, #53593MO
STEPHEN CASEY, #58879MO
JAMES REDD, #66172MO
Assistant United States Attorneys
111 S. 10th Street, 20th Floor
St. Louis, MO 63102
Erin.Granger@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2021, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon:

Beau B. Brindley
Michael Thompson
LAW OFFICES OF BEAU B BRINDLEY
53 West Jackson Blvd.
Suite 1410
Chicago, IL 60604


*s/ Erin Granger*
ERIN GRANGER, #53593MO
Assistant United States Attorney